UNITED STATES of America, State of California, by and through its Attorney General, Daniel E. Lungren, State of Connecticut, by and through its Attorney General, Richard Blumenthal, State of Illinois, by and through its Attorney General, Jim Ryan, Commonwealth of Massachusetts, by and through its Attorney General, Scott Harshberger, State of New York, by and through its Attorney General, Dennis C. Vacco, State of Washington, by and through its Attorney General, Christine O. Gregoire, and State of Wisconsin, by and through its Attorney General, James E. Doyle, Jr., Plaintiffs,

v.

THE THOMSON CORPORATION and West Publishing Company, Defendants.

Civil Action No. 96–1415 (PLF).

United States District Court, District of Columbia.

Dec. 23, 1996.

Keith Stuart Blair, U.S. Dept. of Justice, Antitrust Division, Civil Task Force and Craig W. Conrath, Department of Justice, Antitrust Division, Washington, DC, for Plaintiffs.

Wayne D. Collins, Shearman & Sterling, New York City, for Thomson and West.

Constance Michael Spheeris, Arlington, VA, for Tax Analysts.

Gary LeLand Reback, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for Lexis–Nexis.

## OPINION

PAUL L. FRIEDMAN, District Judge.

The United States and seven states filed suit under the federal antitrust laws to prevent the acquisition of West Publishing Company by The Thomson Corporation. Plaintiffs have now moved for entry of a Final Judgment and defendants have consented to its entry. The Court must determine whether the proposed Final Judgment is in the "public interest" under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16 (the "Tunney Act"). After thoroughly reviewing the briefs and other materials submitted by the parties and *amicus curiae* Lexis–Nexis, a division of Reed Elsevier, Inc., and Hyper Law, Inc., and the 26 public comments submitted to the Department of Justice, and carefully considering the arguments presented at the Tunney Act hearing before the Court, the Court finds that the Proposed Final Judgment is in the public interest but for one provision.[1]

## I. BACKGROUND

### A. The Complaint

On June 19, 1996, the United States, through the Antitrust Division of the United States Department of Justice, along with the States of California, Connecticut, Illinois, Massachusetts, New York, Washington and Wisconsin filed a lawsuit under Section 7 of the Clayton Act, 15 U.S.C. § 18, against The

---

1. The Court found particularly helpful the public comments of Lexis–Nexis and Hyper Law, Edward Jessen, the Reporter of Decisions in California, the American Association of Law Libraries, Matthew Bender & Company, Inc., Ger- onimo Development Corporation, CD Law, Inc., Alois Gross, and Kathleen Joe Gibson, the Secretary and Clerk to the New Mexico Compilation Commission.

Thomson Corporation and West Publishing Company, the largest and third largest publishers of law books and legal research materials in the United States, to prevent the proposed acquisition of West by Thomson.

The complaint alleged that the acquisition would reduce competition in the markets in which Thomson and West are direct competitors, specifically, in nine "enhanced primary law" markets, 47 secondary law products' markets, and the comprehensive online legal research market. Noting that Thomson and West are the only print publishers of nine enhanced Codes or case law reporters and two of a very few publishers of a number of competing secondary law products, plaintiffs alleged that the elimination of competition between the two companies would, in all likelihood, increase prices and reduce quality in these markets. Plaintiffs also alleged that the acquisition is likely to reduce competition in the provision of comprehensive online legal research services by reducing Thomson's incentives to continue providing certain products, including its electronic case law citation service, known as Auto–Cite, to Lexis–Nexis, at the current levels of price and quality. Lexis–Nexis depends upon its access to some of Thomson's products, including Auto–Cite, to compete effectively against the only other online legal research service, WestLaw, which is owned by West.

The nine enhanced primary law markets that are the subject of the complaint are the United States Code, United States Supreme Court case law, the California Code, California case law, the Massachusetts Code, the Michigan Code, the New York Code, Washington case law and Wisconsin case law. West and Thomson publish competing so-called "enhanced" products in these markets; in some markets they are the *only* publishers of such products. These enhanced products differ from other legal research products because they contain not only the Code or case law for the jurisdiction but also headnotes, summaries and/or annotations; unenhanced Codes and case law publications therefore are not substitutes for them.

With respect to these enhanced products, Thomson and West have been each other's closest competitors and, according to the complaint, the acquisition of West by Thomson would substantially increase concentration in these markets and create or exacerbate barriers to entry by other potential competitors. The complaint describes with some specificity the difficulties encountered by new entrants that reduce competition in these markets. To be successful, for example, a new entrant would require access to past and current court opinions and statutes that may not be available from the courts themselves or whose acquisition would be costly and time-consuming. In addition, a highly skilled editorial staff would be needed to create the case notes, summaries and annotations that are currently produced by West or Thomson. *See* Complaint ¶¶ 30–31. Several commentators also worried that such staff will be difficult to obtain.

Finally, and of particular importance, West has long claimed that it has a copyright in what is commonly referred to as "star pagination," the insertion of numeric symbols in the text of decisions to indicate the equivalent West reporter page break and page number. Star pagination permits an individual to rely on a printed decision not published by West while retaining the ability to cite to the West's National Reporter System. This ability is critical because citations to West's National Reporter System are commonly required or expected by courts and therefore are a pervasive part of legal practice and research wherever West publishes a reporter for a jurisdiction. Yet West maintains that anyone who uses or copies its "star pagination" is infringing its copyright. Thus, existing or potential participants in the market for primary law products cannot offer products with star pagination without the threat of costly copyright infringement litigation. In fact, the complaint cites star pagination as an anticompetitive factor in all three areas of concern: primary enhanced law markets, secondary enhanced law products and, indirectly, online research. Complaint ¶¶ 32, 43, 52.

Thomson and West also compete directly with each other for print and/or CD–ROM sales of national and state secondary law products, including treatises and practice and procedure materials, in a number of markets.

The complaint alleged that because Thomson and West compete directly over price, product quality and product innovation for numerous secondary law products, a combination of the two companies would eliminate this competition, raise prices and reduce quality. In addition, it alleged that West's star pagination copyright infringement claim would chill potential entry into these markets and harm competition because secondary law products rely on the ability to cite to the West National Reporter System. Complaint ¶ 43.

Online legal research services permit subscribers, using software, to access and navigate large databases containing primary and secondary law products; such services also provide access and cross-references to myriad other legal and non-legal resources. Because online legal research is fast, flexible and comprehensive, print versions of the law and full text and word searching of primary law on CD–ROMs are not adequate substitutes for online services, nor is the Internet. Complaint ¶¶ 50–52. Lexis–Nexis and West-Law (owned by West) are the two largest comprehensive online legal research services. They are direct competitors and their products are substitutes for one another. According to the complaint, no other competitor currently exists or is likely to enter this market. Complaint ¶ 58.

West places its own primary and secondary law products on WestLaw, while Lexis–Nexis places its own and third party materials, including some Thomson enhanced primary and secondary law products, on its service. Primary among these is Auto–Cite, which is used to gather negative commentary on a case and quickly determines the case history for use in correct citation. Thomson licenses Auto–Cite, as well as certain non-legal databases including Investext, ASAP and Predicasts, to Lexis–Nexis.[2]

The complaint predicted that the acquisition of West by Thomson would harm competition in the market for comprehensive online legal research services by encouraging Thomson to increase prices, reduce quality and innovation, and/or withhold access to a number of products it now licenses to Lexis–Nexis, including Auto–Cite. This conduct would materially injure Lexis–Nexis's ability to compete effectively with the comprehensive online legal research services of the merged company. Furthermore, the complaint alleged that in the event of such exercise of market power by Thomson, Lexis–Nexis would be unable or unlikely to replace the licensed Thomson products so as to maintain the pre-merger level of competition in the comprehensive online legal service market.[3]

In conjunction with their complaint, plaintiffs filed a Proposed Final Judgment, a Competitive Impact Statement, and a Stipulation and proposed Order under which the defendants agreed to abide by and comply with the provisions of the Proposed Final Judgment pending its entry by the Court. Judge Richey, to whom this case initially was assigned, entered the Stipulation and Order on June 19, 1996. Under the terms of the Proposed Final Judgment, Thomson would be permitted to complete its acquisition of West in return for divesting itself of certain assets, licensing star pagination, giving certain third parties the option to extend various third party licenses, and giving certain states the option to terminate their contracts with West or Thomson. Plaintiffs, West and Thomson now assert that the Proposed Final Judgment will sufficiently ameliorate the anticompetitive effects of the merger identified in the complaint.

---

**2.** Investext is a collection of approximately 200 brokerage house reports regarding individual equities and industries. ASAP is an indexed consolidation of approximately 450 specialized industry publications. Predicasts includes the following three databases: (1) PROMT, an indexed database of over 1,100 trade and business publications; (2) MARS, an indexed database that includes information relating to advertising and marketing of consumer products and services; and (3) Newsletter, an indexed international database including 650 different newsletters from 165 publishers. Complaint ¶ 56.

**3.** In addition to Auto–Cite, Investext, ASAP and Predicasts, other products mentioned in the complaint that are now licensed by Thomson to Lexis–Nexis are the United States Code Service ("U.S.C.S."), Deering's California Code Annotated, the Annotated Laws of Massachusetts, New York Consolidated Laws Services, Michigan Statutes Annotated and WestTex.

According to the Competitive Impact Statement, the Proposed Final Judgment will preserve competition in the nine enhanced primary law markets by requiring Thomson/West to divest itself of one enhanced Code product for each of the following jurisdictions: the United States, California, Michigan and New York, and by requiring divestiture of United States Supreme Court Reports, Lawyers' Edition, a Supreme Court case law reporter. The Proposed Final Judgment also permits three states—California, Washington and Wisconsin—to reopen the bidding on the contracts to publish the official state reporter, allowing these states to cause a divestiture of their state's reporter products if they so choose. The Proposed Final Judgment further requires that one secondary law product in each of the secondary law markets identified in the complaint be divested. In addition, Thomson would be required to divest itself of Auto–Cite and extend the terms of existing licenses of Investext, ASAP and Predicasts to Lexis–Nexis. Finally, Thomson/West would be required to license the use of star pagination in the National Reporter System to any legal publisher desiring such a license, notwithstanding West's copyright claim to star pagination.

## B. Procedural History

The Proposed Final Judgment and Competitive Impact Statement and a summary of the terms of the Proposed Final Judgment and directions for the submission of written comments relating to the Proposed Final Judgment were published in the Federal Register on July 5, 1996, as well as in the *Washington Post. See* 15 U.S.C. § 16(b) and (c). The 60–day period for public comments

expired on September 3, 1996 and, as of September 23, 1996, plaintiffs had received comments from 26 persons or entities. On September 23, 1996, the United States, joined by six of the seven state plaintiffs, filed with the Court their Response to Public Comments. Plaintiffs published that Response in the Federal Register on October 11, 1996. *See* 61 Fed.Reg. 53386; 15 U.S.C. § 16(d).[4] On September 24, 1996, Thomson and West filed their Response to Public Comments with the Court. The Court therefore finds that the government has complied with all the procedural requirements of the Tunney Act.

On July 31, 1996, Judge Richey denied the motion of Tax Analysts to intervene or to participate as *amicus curiae* in this matter.[5] On September 25, 1996, the Court entered a Memorandum Opinion and Order denying the motion of Lexis–Nexis to intervene in this matter but granting the alternative motion of Lexis–Nexis to appear as *amicus curiae* and to participate in the Tunney Act hearing. The Court also granted the motion of Hyper Law, Inc. to participate as *amicus curiae* by filing a brief, but it declined to permit Hyper Law to participate in the hearing. On that same day, the Court denied the motions of CD Law, Inc., Taxpayer Assets Project and Versus Law to participate as *amicus curiae.* On September 30, 1996, the Court held an extended hearing, at which it heard argument from counsel for the United States, the state plaintiffs, Thomson and West, and Lexis–Nexis.

On October 9, 1996, the Court entered an order granting Hyper Law's motion for leave to file its *amicus curiae* brief with certain time restrictions, denying Taxpayer Assets Project's motion for reconsideration of the denial of its motion to participate as *amicus*

4. The State of Connecticut did not join in the Response to Comments but, as explained at the Tunney Act hearing, its failure to do so was for logistical reasons and not because it disagreed with the Response or otherwise disassociated itself from the position of the other state plaintiffs. The State of Connecticut joined in the Motion of Plaintiffs for Entry of the Revised Final Judgment, filed on October 23, 1996.

5. On November 12, 1996, this Court denied Tax Analysts' motion for reconsideration of its denial of *amicus curiae* status and its motion for ap-

pointment of a special master or for the taking of expert testimony. While, as Tax Analysts points out, Section 16(f)(1) of the Tunney Act provides for the taking of testimony of expert witnesses "upon the motion of any party or participant or upon its own motion, as the court may deem appropriate," 15 U.S.C. § 16(f)(1), the statute clearly provides discretion to the court to decide if such testimony is "appropriate." In this case, the Court concludes that no expert testimony is required.

*curiae,* granting the motion of Lexis–Nexis for leave to file the declarations of certain law librarians, and granting the motion of Lexis–Nexis to file a supplemental brief on two of the numerous issues on which it sought leave to be heard further: (1) whether the entry of the Proposed Final Judgment would constitute a "taking" of Lexis–Nexis' property without just compensation in violation of the Fifth Amendment; and (2) "any *new* argument and information with respect to its concerns about the assurances provided by West and Thomson regarding the citation of ALR as part of Auto–Cite, assuming there is anything new to add to what already has been submitted." [6]

On October 23, 1996, plaintiffs filed a motion for entry of a revised Proposed Final Judgment, a memorandum in support of that motion, and a revised Proposed Final Judgment. The post-hearing revisions agreed to by the parties and now proposed to the Court are as follows:

1. Section 3.01 of Exhibit B to the Final Judgment, the star pagination license, would be amended to delete the clause, "(i) shall respect and not contest the validity of the copyrights claimed by Licensor in Licensor's arrangements of case reports in NRS Reporters as expressed by NRS Pagination; and (ii)." The purpose of this revision is to eliminate the contractual restriction on a licensee not to contest the validity of the star pagination copyright claimed by West during the term of the license.

2. Paragraph II.B. of the Final Judgment would be revised to add after "the assignment of the Auto–Cite License Agreement," a new clause: "if permitted by contract or otherwise the transfer of the economic benefits equivalent to those received by Thomson under the Auto–Cite License Agreement."

3. A new paragraph IV.H. would be added to the Final Judgment that would read: "Defendants shall not claim or assert any right to prohibit an Acquirer from including in any of the

Divestiture Products or any other publications cross-references to the Defendant's products of the type contained in Thomson's Total Client Service Library ("TCSL") or Integrated Legal Research System ("ILRS"). Defendants shall not claim or assert any right to prohibit an Acquirer from including in Auto–Cite cross-references to Thomson's American Law Reports or other annotations of the type that are now included in Auto–Cite."

4. In Paragraph II.B. the word "sublicensable" would be added to the description of the license associated with the divested copy of the historical Auto–Cite database. The original phrase "delivery of a transferrable royalty-free perpetual license of the Auto–Cite database" would now read "delivery of a transferrable sublicensable royalty-free perpetual license of the Auto–Cite database." The purpose of this revision is to make clear that the acquirer of Auto–Cite can sublicense the database.

## II. DISCUSSION

### A. Tunney Act Proceedings

■ The responsibility of the district court and the proper scope of its "public interest" inquiry in a Tunney Act proceeding were spelled out most recently by our court of appeals in *United States v. Microsoft Corp.,* 56 F.3d 1448 (D.C.Cir.1995). The court made plain that the district court should not second guess the prosecutorial decisions of the Antitrust Division regarding the nature or scope of the claims brought in the first instance. Rather, the court is to compare the complaint filed by the government with the proposed consent decree and determine whether the remedies negotiated between the parties and proposed by the Justice Department clearly and effectively address the anticompetitive harms initially identified. In other words, the court "may not reach be-

---

**6.** On November 12, 1996, the Court denied the motion of Geronimo Development Corporation to participate as *amicus curiae.*

yond the complaint to evaluate claims that the government did *not* make." 56 F.3d at 1459. *See also United States v. American Telephone and Telegraph Co.*, 552 F.Supp. 131, 151 (D.D.C.1982), *judgment aff'd, Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

■ On the other hand, the Court is not merely a "judicial rubber stamp[ ]"; it is required to make "an independent determination as to whether or not entry of a proposed consent decree is in the public interest." *United States v. Microsoft Corp.*, 56 F.3d at 1458 (quoting H.R.REP. No. 1463, 93d Cong., 2d Sess. 8 (1974) ("House Report"), and S.REP. No. 298, 93d Cong. 1st Sess. 5 (1974) ("Senate Report"), *reprinted in* 1974 U.S.C.C.A.N. 6535, 6538, 6539). In making this determination, the Tunney Act provides that the Court "may consider—"

> (1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;
>
> (2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint. . . .

15 U.S.C. § 16(e); *see United States v. Microsoft Corp.*, 56 F.3d at 1458.

■ The D.C.Circuit has focused on several factors that are particularly important for a court to consider in the exercise of its discretion. In particular, the court should "hesitate" in the face of specific objections from directly affected third parties before concluding that a proposed final judgment is in the public interest. *United States v. Microsoft Corp.*, 56 F.3d at 1462; *see* 15 U.S.C. § 16(e). The court should pay "special attention" to the clarity of the proposed consent decree and to the adequacy of its compliance mechanisms in order to assure that the decree is sufficiently precise and the compliance mechanisms sufficiently effective to enable the court to manage the implementation of the consent decree and resolve any subsequent disputes. *United States v. Microsoft Corp.*, 56 F.3d at 1461–62.

■ While the focus of the public interest inquiry, of course, is on "the issue of competition and the effects on competition" posed by a proposed merger "which are at the heart of the antitrust laws, . . . other factors are not irrelevant." *United States v. AT & T*, 552 F.Supp. at 150; *see id.* at 149 n. 77. "[T]he Court may at the relief stage prohibit practices which have not been found unlawful if such prohibition is necessary to avoid the recurrence of monopolization," *id.* at 150 n. 80, and "may consider factors other than [the consent decree's] effect on competition." *Id.* at 150 n. 81. *See* House Report at 11–12 (deletion of the words "as defined by law" that formerly modified "public interest" was done "as a recognition that the content of the phrase, 'public interest,' is a product of judicial construction" and that to have defined "public interest" solely in terms of antitrust law would have been too narrow). For example, "the Court would be justified in rejecting the proposed decree or requiring its modification if it concluded that the decree unnecessarily conflicts with important public policies other than the polic[ies] embodied in the [antitrust laws]." *United States v. AT & T*, 552 F.Supp. at 151; *see also id.* at 151 n. 83.

■ Above all, the consent decree and Proposed Final Judgment are the products of a negotiated settlement from which, presumably, no party obtained everything it wanted. Thus, "remedies which appear less than vigorous may well reflect an underlying weakness in the government's case," or an assessment made after extensive investigation, the details of which are not before the court, that more could not likely have been achieved by a trial, or merely a legitimate cost of settlement in lieu of trial. *United States v. Microsoft Corp.*, 56 F.3d at 1460–61. According due deference to the "government's predictions as to the effect of the proposed remedies," *id.* at 1461, the district court is not to determine on its own authority what "best serves society" but, rather, whether the proposal presented to it is "within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d at 1460

(quoting *United States v. Western Electric Co.,* 900 F.2d 283, 309 (D.C.Cir.1990), and *United States v. Bechtel Corp.,* 648 F.2d 660, 666 (9th Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981)).

The Court concludes that the Proposed Final Judgment in this case—as modified by the parties in response to the public comments, the tenacity of Lexis–Nexis, and the persuasiveness of the Reporter of Decisions in California and others, as well as to the concerns expressed by the Court at the Tunney Act hearing—is in the public interest except for the star pagination license provision. The consent decree is not ambiguous and appears to pose no serious difficulties in implementation. *United States v. Microsoft Corp.,* 56 F.3d at 1461–62. After the clarifying language agreed to by the parties and the revisions proposed following the Tunney Act hearing, the Court is persuaded that the Proposed Final Judgment adequately addresses all but one of the anticompetitive claims raised by the complaint and therefore is in the public interest with one, albeit very important exception.[7]

### B. *Divestiture*

■ The primary negotiated remedy for the anticompetitive aspects of the merger proposed to the Court is divestiture of certain publications now owned by Thomson companies.[8] Several commentators expressed concern, however, that the publications slated for divestiture under the Proposed Final Judgment will not remain viable unless additional products and rights also are divested. Others maintain that the divestiture of competing products is not sufficient and that entire subsidiary companies of Thomson must be divested instead.

The Court concludes that the remedies structured by the Department of Justice sufficiently assure that the divested products will remain viable, recognizing the inherent uncertainty in such predictions. Acquirers of divested products will receive all production assets of the divested products, including their intellectual property, work in progress, plates, films, master tapes, machine readable codes for CD–ROM production, existing inventory, correspondence and files, a copy of the current subscriber list and related subscriber information, advertising materials, contracts with authors, software and, at the acquirers' option, computers and other physical assets. *See* Proposed Final Judgment ¶ II.B. In addition, Thomson must provide transition production of the acquired products on behalf of the acquirers for a reason-

7. *Amicus curiae* Hyper Law, Inc., requested the Court to require disclosure of more documents by the government, including previously undisclosed investigative documents, and further publication in the Federal Register before the decree is approved, as well as certain modifications to the decree. There is, however, nothing in the statute or in the case law that requires additional disclosure of documents or further publication and opportunity for comment. Furthermore, since the enactment of the Tunney Act no Court has required the United States to disclose its investigatory files as a condition for approving a decree. *Cf. United States v. Microsoft Corp.,* 56 F.3d at 1459.

8. The parties propose to require Thomson/West to divest itself of the following 52 publications: United States Code Service, U.S. Supreme Court Reports, Lawyers' Edition, U.S. Digest, Manual of Federal Practice, Bankruptcy Law & Practice, Bankruptcy (Epstein, Nickels & White), Corbin on Contracts, Insurance Law (Appleman), Search & Seizure (Thomson), Ballantine's Law Dictionary, Auto–Cite, Deering's Annotated California Code, California ADR Practice Guide, California Civil Practice Handbook, California Civil Trialbook, California Litigation By the Numbers Court Rules Companion, California Negligence and Settlement, California Products Liability Law & Practice, California Trial, California Tort Law, Modern California Discovery, Colorado Trial Handbook, Trial Handbook for Connecticut Lawyers, Florida Criminal Law Practice & Procedure, Florida Evidence 2d, Illinois Jurisprudence, Indiana Appellate Handbook 2d, Kentucky Probate PSL, Kentucky Workers' Compensation PSL, Louisiana Code of Evidence Annotated, Louisiana Successions, Louisiana Workers' Compensation, Annotated Laws of Massachusetts, Massachusetts Corporations PSL, Massachusetts Domestic Relations PSL, Massachusetts Landlord–Tenant Law, Massachusetts Real Estate PSL, Michigan Criminal Law, Michigan Statutes Annotated, Michigan Digest, New Jersey Criminal Procedure, New York Consolidated Laws Service, New York Wills & Trusts, Ohio Family Law, Ohio Probate, Modern Texas Discovery, Texas Civil Pre–Trial Procedure, Texas Trial & Appellate Practice, Washington Trial Handbook, Michigan Law & Practice, New York Estate Administration, Pennsylvania Law Encyclopedia. *See* Exhibits A.1 & A.2 to the Proposed Final Judgment.

able period of time and at a reasonable price. *See* Proposed Final Judgment ¶ IV.C. Thomson/West may not interfere with any negotiations by acquirers to make offers of employment to Thomson/West employees whose primary responsibility is the production, sale or marketing of divested products, and the Justice Department has found ample evidence of the availability of trained editorial staff outside of Thomson/West. Indeed, many of the potential buyers already possess editorial staff and publishing infrastructure. *See* Proposed Final Judgment ¶ IV.F. Thomson/West must preserve the divested products until divestiture is made and cannot reassign employees to avoid their being hired by acquirers. *See* Proposed Final Judgment ¶¶ VIII.A–C. Finally, all divestitures are subject to the approval of the United States after consultation with the state plaintiffs, and divestiture of state specific products are subject to the approval of both the United States and the appropriate state plaintiff. *See* Proposed Final Judgment ¶ IV.B. With these provisions in the Final Judgment, the government was reasonable in concluding, after a thorough investigation, that the divested products will attract strong, capable buyers who will be able to ensure the viability of the products they acquire.

Some of the public comments argued that preservation of competition in secondary law products markets would require divestiture not merely of individual publications but of entire Thomson subsidiary companies. Arguing that the focus on individual products is itself analytically flawed, these comments asserted that products within the West and Thomson cross-referencing systems are interdependent and that no single product could effectively or meaningfully be extricated, that the companies' brand names carry goodwill and recognition without which individual products will falter, that Thomson products benefit from economies of scale that will be lost upon divestiture, and finally that cross-references to other Thompson products cannot effectively be reproduced by non-Thomson companies that lack access to the editorial staff and resources of other Thomson publications. By contrast, the government found that competition between individual West and Thomson products is based

primarily on substantive content in the publications, including their differing enhancements and cross-references, and that the valuable cross-referencing would continue regardless of the ownership of the publication. *See* Plaintiffs' Response to Public Comments at 12, 16.

The commentators, including Lexis–Nexis, rely in part for this argument on the assertion that acquirers of divested products will either no longer be permitted to cross-reference Thomson's other products or will be dependent on Thomson for those cross-references. Defendants in turn assert that acquirers would be free to cross-cite without interference from Thomson of any kind or the payment of any fee for the right to cross-reference. The government found no proprietary barriers to cross-referencing to Thomson products, since Thomson has never objected to cross-references to its products by other publishers, claimed a proprietary interest in such cross-references or charged a royalty for them. Rather, the government reasoned that such cross-referencing would be in Thomson's interests, and Thomson confirmed in writing that it will continue its practice of open citation to its Total Client Service Library ("TCSL") products after the merger. *See* Letter from Thomson Corporation to U.S. Department of Justice (Sept. 18, 1996), Tab 4, Defendants' Response to Public Comments.

In order to remove any doubt about the ability of acquirers to cross-cite to products retained by Thomson, following the Tunney Act hearing the parties agreed to incorporate a specific provision—Paragraph IV.H—into the Final Judgment that reads as follows:

> Defendants shall not claim or assert any right to prohibit an Acquirer from including in any of the Divestiture Products or any other publications cross-references to the Defendant's products of the type contained in Thomson's Total Client Service Library ("TCSL") or Integrated Legal Research System ("ILRS"). Defendants shall not claim or assert any right to prohibit an Acquirer from including in Auto–Cite cross-references to Thomson's American Law Reports or other annotations of

the type that are now included in Auto–Cite.

In view of this revision of the decree, the Court concludes that Thomson will not be able to undermine divestiture products by withholding cross-cites or extracting fees from acquirers for cross-citing.

Furthermore, after an extensive investigation—which included the subpoena of documents from defendants, depositions of employees and officers of defendants, and interviews of law librarians, competing legal publishers and other legal publishing industry participants—the government concluded that divestiture of entire companies was not necessary in order ·to preserve acquirers' ability to cross-reference individual products. The government found that there was "relatively little evidence of joint production of Thomson products," Plaintiffs' Response to Public Comments at 7, and that cross-referenced individual products therefore could be effectively maintained by non-Thomson entities. While this conclusion is less well supported on the record before the Court (the government provides just one sentence in its response to this particular concern, *see* Plaintiffs' Response to Public Comments at 7), in view of the extensive provisions in the Proposed Final Judgment designed to ensure viability and the deference due to the governments' factual findings in this regard, the Court accepts the government's representation that acquirers will be able to reproduce cross-references to Thomson products as effectively as Thomson has been able to do in the past.

With respect to the concern that certain brand names carry valuable goodwill and that brand names are important to a divestiture product's viability, the Proposed Final Judgment includes the divestiture of what the Justice Department concluded were the most important such brand names, for example, Deering's Annotated California Code, Corbin on Contracts, and United States Supreme Court Reports, Lawyers' Edition. *See* Proposed Final Judgment, Exhibit A.1; Plaintiffs' Response to Public Comments at 16. The Court accepts as reasonable the government's finding that the divestiture of other brand names is unnecessary to maintain competition in the identified markets.

Several commentators maintained that Thomson/West should be required to divest themselves of either Thomson's American Jurisprudence ("AmJur") series or West's Corpus Juris Secundum ("CJS") because the merger would eliminate competition between the two. The Department of Justice investigated whether the combination of these products would lessen competition in some relevant market and concluded that, although AmJur and CJS are both national legal encyclopedias, they cannot meaningfully be said to be competing products. As Professor Robert C. Berring explained:

Each of these sets is called a national legal encyclopedia but they are hardly in competition. Corpus Juris Secundum (CJS) was authored in the 1930s and 1940s. Many of the volumes are still original. When it was written, its goal was to be a comprehensive explanation of all cases on all topics.... This mission became impossible as the avalanche of new cases grew larger. Rather than change or redo the set, West decided just to keep producing pocket parts for it. The volume on Monopolies is a great example. It is fifty years old. It has an eighty page pocket part. There is no possible way that the pocket part could bring the set up to date. If West had wanted to keep the set truly relevant they [sic] would have had to issue a third revision starting in the eighties.... West did not, and the decision was probably wise. The comprehensive approach is simply unmanageable these days. For many who work in the field CJS is thus a pretty much dead set.

AmJur 2d was produced in the 1970s. It is not an attempt to explain everything, it is instead, an attempt to give background on major topics with lots of references. It is written in a more readable style. Some academics criticize it for trying to oversimplify, but that is its mission. It is a great place to send college students who want some background, or a lawyer who is entering new subject areas. But it should never be cited as authority. It is deep background. It gives citations to

cases, the TCSL and ALR annotations that might provide more depth, but it is largely explanatory.

Thus I see CJS as an attempt to provide a tool for lawyers that has been largely abandoned, and AmJur 2d as a general tool for those needing some background that is very much alive.

Affidavit of Robert C. Berring ¶ 3 (Apr. 29, 1996), Ex. 6 to Thomson's and West's Response to Public Comments. The government was entitled to rely on presentations of such quality in concluding that CJS is not a strong competitor with AmJur2d. *See United States v. Microsoft Corp.*, 56 F.3d at 1461.

Furthermore, while West has not released CJS as a CD–ROM product and has no plans to do so, AmJur is one of Thomson's best-selling CD–ROM products. In view of the insignificant demand for CJS and the lack of meaningful competition between the two products, the government reasonably decided to omit any claim from its complaint that the common ownership of these two products would threaten competition in violation of the Clayton Act. Given the absence of such a claim in the complaint, the issue is beyond the scope of this Tunney Act review proceeding. *See United States v. Microsoft Corp.*, 56 F.3d at 1459. Even if the CJS/AmJur2d issue were somehow relevant to the complaint by virtue of the cross-referencing controversy and therefore a proper topic for review, it appears to the Court that the Department of Justice had an adequate factual foundation to reasonably conclude that there was no meaningful competition between the two publications and that the merger therefore would not have an anticompetitive effect with respect to those products.

In sum, based on extensive investigation and analysis, the government concluded that the divestiture products will remain viable and that their divestiture is sufficient to cure the anticompetitive effects of the merger in the relevant markets for such products. It is not the Court's role to second-guess these factual and reasoned predictive findings. *See United States v. Microsoft Corp.*, 56 F.3d at 1461. The Court concludes that the Proposed Final Judgment adequately ensures the viability of the divested Thomson products, thereby curing the specific allegations in the complaint that competition would be eliminated in those particular product markets.[9]

## C. *Giving a Divestiture Option To States With Official Reporter Contracts*

■ · Several commentators expressed concerns about the scope and terms of the provision of the Proposed Final Judgment that requires Thomson to grant the Official Reporter contract states the option to terminate their Thomson contracts for publishing official reporters.

### 1. *California*

Edward Jessen, the Official Reporter of Decisions and Secretary of the Advisory Committee for Publication of the Official Reports of the State of California, initially questioned whether the Proposed Final Judgment adequately addressed the fact that California Reports and Deering's California Codes share costs and text and should remain together to stay competitive.

The revised Proposed Final Judgment in its most recent incarnation requires that Deering's and its assets be divested, and that California Reports and all its related assets also be divested if the governing entity in California chooses to award the official publisher contract to a different firm. This provision allows the California governing body to concur in the need for divestiture of its official reporter assets and to decide who should buy them in light of the new owner-

---

9. One commentator, Alois Gross, interprets some of the language in the Proposed Final Judgment to require bidders for divestiture products to bid on the entire list of divestiture products and to forbid bidding on single products. He also states that he was given this information by a Thomson representative and that his firm was not given information about the individual products on which it wished to bid. The Court understands the Proposed Final Judgment to provide that a potential acquirer may bid on any or all divestiture products. Any potential bidder therefore is entitled to information about any single divestiture product or set of products. *See* Proposed Final Judgment; ¶¶ IV.E, IV.F. Neither plaintiffs nor defendants have proffered any other interpretation of the proposed Final Judgment.

ship of Deering's.[10] Thus, the Advisory Committee Mr. Jessen represents will now decide whether to divest Thomson of California's official reporter assets or to continue with Thomson. As a result, by letter of September 17, 1996, Mr. Jessen indicated that he "now fully support[s] the proposed consent decree for the Thomson/West transaction as sufficient to protect California's interests...."

### 2. *Washington*

CD Law, Inc. of Seattle, Washington, publishes case law, administrative law, and other Washington state legal materials on CD–ROM and the Internet. CD Law commented that "Thomson and West competed vigorously for the contract to publish the official Washington state reports" and that "there are virtually no publishers capable of competing with West/Thomson." CD Law also pointed out that it publishes only in electronic media and cannot compete in the print market and argued that no other company could viably compete with the post-merger Thomson/West conglomerate.

The government, however, rejected CD Law's characterization of the market, finding that Thomson and West are not the only competitors in the State of Washington. The government pointed to Darby, which currently holds the official reporter contracts for Georgia and the Virginia Supreme Court and recently was named the successful bidder in Michigan, and to Michie, which publishes numerous print and CD–ROM codes and case reporters, as examples of serious potential bidders. The Court accepts the governments' conclusion that the existence of these publishers will ensure vigorous competition in Washington, particularly because this conclusion has been adopted by the State of Washington itself.

CD Law also expressed its concern that if Thomson/West were to publish the official state reports it would not renew CD Law's contract to write the headnotes for the official state reports and that Thomson/West's control of the official headnotes will adversely affect competition in the CD–ROM market. The government responded that this concern does not flow from the merger, as Thomson could have decided not to renew its contract with CD Law and instead to write its own headnotes at any time regardless of the merger.

The Court finds this argument unpersuasive for two reasons that flow directly from the new post-merger landscape. First, West formerly competed with CD Law for the headnote contract and therefore a post-merger Thomson/West clearly would have an incentive to end its contract with CD Law. Second, assuming for the moment the accuracy of CD Law's description of the CD–ROM market, if Thomson/West were to retain the official reporter contract, Thomson/West would be able to deny CD Law access to official headnotes for use in its CD–ROM products. While the government argues that CD Law can produce its own headnotes, it is clear that access to the official headnotes for a state reporter is a valuable right that CD Law might well lose. In the worst case scenario, Thomson/West's control over the print market could so adversely affect competition in the electronic media markets as to drive CD Law out of business. Since the government relies heavily on the presence of CD Law in the Washington market to preserve competition, such a development would be contrary to the stated goals of the consent decree.[11]

The United States and the State of Washington have concluded that this is not a likely consequence of the merger, however, and the Tunney Act does not contemplate de novo judicial review of such fact-intensive calculations. Rather, on such issues as this, the Court is to give a substantial degree of deference to the government's predictions concerning the impact of such mergers and proposed remedies on competition. *See United States v. Microsoft Corp.*, 56 F.3d at 1460–61.

---

**10.** The Proposed Final Judgment treats the states of Washington and Wisconsin exactly the same way.

**11.** If Washington were to choose to award the official reports contract to another publisher, this concern over the headnotes would disappear since the Proposed Final Judgment requires Thomson to transfer any intellectual property rights in the headnotes to the state. Proposed Final Judgment ¶ XI.C.

Most important to this Court's analysis is the fact that Washington State itself supports the consent decree and is presumably in the best position to assess the interests of its consumer citizens. The Court therefore cannot find that the consent decree is not in the public interest with respect to the State of Washington.[12]

### 3. *Other States*

John H. Lederer, Esq., a retired attorney in Oregon, Wisconsin, expressed concern that defendants, who currently publish the only two competing state reporters, will be the only bidders for the Wisconsin official reporter contract. The government concluded, however, that because a number of companies bid for various official reporter contracts in a number of states, any of these companies potentially could bid for the Wisconsin official reporter contract once Thomson divests itself of it. *See* Proposed Final Judgment ¶ XI.A–C. Again, the divestiture remedy for official contract states is designed to permit states such as Wisconsin to decide whether or not to switch from Thomson to another publisher, and the state of Wisconsin by and through its Attorney General concurs in this arrangement. These factors are sufficient for the Court to find this divestiture to be in the public interest.

Darby Printing Company, a printer of court opinions in a number of states, requested that Illinois, Massachusetts and New York (where Thomson publishes other official reporters) also be given the opportunity to reopen bidding for official reporter contracts. The Court need not reach this issue, however, because in these three states Thomson is merely the printer and has no editorial control over the reporters; the states themselves write the headnotes and summaries and make other editorial judgments about content. The only editorial competition in these states is between the state and West, and this competitive arrangement will be unaffected by the merger. These states do not need a court order to choose a new

printer that is adequate to replace Thomson, and many printers could do the job, including Darby. Finally, the Court notes that the States of Illinois, Massachusetts and New York joined in the complaint and have approved the settlement.

Ms. Kathleen Jo Gibson, commenting on behalf of the New Mexico Compilation Commission, also requested that the Proposed Final Judgment give New Mexico as well as other states that have official reporters an option to reopen bidding similar to the option now given to California, Washington and Wisconsin. According to the New Mexico Compilation Commission, "[f]or a number of reasons, it is not economical for small states such as New Mexico to contract with any other publisher . . ."

West has been the official reporter of New Mexico opinions since 1933, and Thomson does not compete in New Mexico with West as the official reporter. The merger therefore does not affect competition for the sale of official reporters in New Mexico, and this proceeding is not the proper forum for obtaining the relief requested. New Mexico's dispute with West over the copyrightability of West-reported New Mexico opinions likewise is also not related to any actual or potential competition likely to be lost as a result of the Thomson/West merger and thus is not an appropriate consideration for this Court.

### D. *Divestiture Of Auto–Cite And Lexis–Nexis' Option To Extend Critical Thomson Content Licenses*

Lexis–Nexis and WestLaw offer virtually identical access to actual court decisions as well as various, different, competing enhancements and secondary legal materials and a wide variety of competing non-legal materials. The complaint alleged in some detail that the merger would harm competition in this comprehensive online legal re-

---

12. CD Law also commented that "the Washington State legal publishing market is pervaded with anti-competitive practices that include predatory pricing, exclusive contracts for certain legal materials, and tying agreements. The Department consent decree does little or nothing to

prevent or ameliorate these practices." These comments go beyond the allegations and issues in the complaint and therefore are not relevant to the Tunney Act proceeding. *See United States v. Microsoft Corp.,* 56 F.3d at 1459–60.

search services market. Specifically, plaintiffs alleged that the merger would

> lessen substantially competition in the market for comprehensive online legal research services by increasing Thomson's incentive to exercise market power by increasing prices for, reducing quality and innovation of, or withholding access to the following products now licensed to Lexis–Nexis: United States Code Service, Deering's California Code Annotated, Annotated Laws of Massachusetts, New York Consolidated Laws Service, and Michigan Statutes Annotated; Auto–Cite; and the important non-legal ˙materials [Investext, ASAP and Predicasts].

Complaint ¶ 59.

Prior to the governments' review of the proposed merger, Thomson and Lexis–Nexis negotiated extensions of the most important licenses for Thomson content, both legal and non-legal. These licenses included the following materials: (1) legal services and publications (including Auto–Cite, the American Law Reports ("ALR"), United States Code Service, and AmJur2d); (2) non-legal databases (including ASAP, Predicasts and Investext); and (3) tax materials from the Research Institute of America. Virtually all of these licenses were extended for five additional years and generally at the prices that had been negotiated when Thomson did not own WestLaw. With the extensions, the average length of the licenses was approximately seven years.

Plaintiffs concluded that two additional protections were necessary beyond the voluntarily extended licenses. First, for the non-legal databases ASAP, Predicasts and Investext, identified by Lexis–Nexis as particularly significant, Thomson was required to extend Lexis–Nexis licenses for an additional five years. Second, Thomson was required to divest itself of Auto–Cite so that Lexis–Nexis could obtain it from an independent source (or buy it itself). Plaintiffs concluded that these two provisions of the Proposed Final Judgment, together with the previously

negotiated license extensions, and the normal market incentives and capabilities of Lexis–Nexis would maintain sufficiently vigorous competition to protect consumers in the comprehensive online legal research services market.

Lexis–Nexis has argued vigorously in its public comments, its *amicus* brief, its posthearing supplemental brief. and at the hearing that these actions are not enough. After very careful consideration, the Court concludes that they are in fact sufficient and that the public interest in comprehensive online research services is served by the consent decree.

### 1. *TCSL And Product Differentiation*

█ Lexis–Nexis argues that the divestiture of the products contained in Thomson's Total Client Service Library ("TCSL") is essential to enable Lexis–Nexis to use the components of the TCSL to compete with WestLaw's Key Numbers and headnotes.[13] It asserts that there are four portions of the TCSL that are essential "enhancements" that Lexis–Nexis must license in order effectively to compete with WestLaw: the annotations found in the American Law Reports ("ALR") and Lawyers' Edition, the AmJur encyclopedia, and Auto–Cite. *See* Declaration of Nicholas R. Emrick ("Emrick Decl.") ¶ 7 (Sept. 11, 1996).

The Court finds that the government was reasonable in concluding that divestiture of the entire TCSL is unnecessary. Lawyers' Edition and Auto–Cite are both divestiture products and Lexis–Nexis will have access to them. The new owner of Lawyers' Edition, if other than Lexis–Nexis, will have every incentive that Thomson had to license to Lexis–Nexis.

The claim that the divestiture of AmJur is essential to Lexis–Nexis is undercut by the fact that AmJur was only added to the Lexis–Nexis service in February 1996 and by Thomson's continuing interest in ensuring that its products are cross-referenced as much as possible. As for ALR, the government found no evidence that Thomson would

---

**13.** Thomson's Total Client Service Library ("TCSL") is a cross-referencing system that provides citations to other products and publications that contain relevant case law and analyses. For example, at the beginning of each Supreme Court case reported in Lawyers' Edition, there is a list of TCSL cross-references that are relevant to that Supreme Court case.

stop publishing ALR after the merger but rather that Thomson had every incentive to maintain and improve ALR, to sell it online, and to see to it that it is cross-referenced. The revised Proposed Final Judgment. expressly provides that

> [d]efendants shall not claim or assert any right to prohibit an Acquirer from including in any of the Divestiture Products or any other publications cross-references to the Defendant's products of the type contained in Thompson's Total Client Service Library ("TCSL") or Integrated Legal Research System ("ILRS"). Defendants shall not claim or assert any right to prohibit an Acquirer from including in Auto-Cite cross-references to Thomson's American Law Reports or other annotations of the type that are now included in Auto-Cite.

Proposed Final Judgment ¶ IV.H. This provision ensures that Thomson may not erect barriers to the cross-referencing of ALR in the unlikely event that it decided that it is in its interests to do so.

Furthermore, the government concluded that ALR is not a substitute for West's Key Number system in finding cases and researching legal issues, that there is no competition between the two systems relevant to the complaint and that Lexis–Nexis does not use ALR as such. Plaintiffs pointed to evidence that "ALR was not viewed by consumers as a place to start research" but rather that "[b]oth attorneys and librarians view ALR as one of many available secondary sources, often cited in the same category as law reviews and treatises." ALR On–Line Market Research Report and Recommendation, Prepared for Thomson Electronic Publishing at 11 (Omnimark, Inc. 1991), Emrick Decl., Exhibit B. Unlike West's Key Number system, "ALRs were not highly regarded as definitive legal research." *Id.* at 12. Indeed, Lexis–Nexis' own sales people reportedly felt that "[a]ttorneys mostly use ALR as a last resort...." *Id.* at 10. Perhaps most importantly, "[n]o one understood the analo-

gy of ALR as a competitive alternative to Headnotes." *Id.* at 9.

Nor is divestiture of the TCSL products necessary to allow Lexis–Nexis to offer a differentiated product. Plaintiffs' investigation revealed that aside from providing the same actual court opinions, Lexis–Nexis and WestLaw enhancements and services are quite different and that Lexis–Nexis continues to add new, non-Thomson publications and databases to its service. In addition, Lexis–Nexis was able to negotiate and extend its license for ALR through the year 2002 and its license for AmJur2d through 2006. Furthermore, the Proposed Final Judgment requires Thomson to grant Lexis–Nexis the option to extend its License Agreements for three non-legal databases—Investext, ASAP and Predicasts—which are offered on Nexis for an additional five years; thus Lexis–Nexis may, at its option, extend these contracts until 2010. Proposed Final Judgment ¶ X. This is sufficient time for Lexis–Nexis to seek the resources to differentiate its product in other ways, or to create competing databases.

In sum, the government found insufficient evidence that either AmJur or ALR must be divested to preserve competition with Corpus Juris Secundum, on the one hand, or the West Key number system on the other. Under the Tunney Act, the Department of Justice has the duty to review the evidence and determine the litigative prospects and under *Microsoft,* the Court will not second-guess these reasonable conclusions.

### 2. *Auto–Cite Divestiture*

■ Auto–Cite is an electronic citation system owned by Thomson. Auto–Cite runs case law through computer software and editing to provide full case law citations, the history of cases and other information, such as cross-references to ALR and other products. In 1979, Thomson licensed Auto–Cite to Mead Data Central; Lexis–Nexis subsequently succeeded to the rights of Mead Data.[14] The original agreement was amended in 1991 to provide that either party could assign the Licensing Agreement and its

---

**14.** The original agreement was between Mead Data and the Lawyers Cooperative Publishing Company, but Thomson succeeded to all the rights and obligations of Lawyers Cooperative which is now a division of Thomson.

rights and obligations thereunder to "any successor to all or substantially all of the business and assets of the assigning party...." Auto–Cite License Agreement ¶ 19.

Under the license, Lexis–Nexis is permitted to reproduce, display and distribute materials in the Auto–Cite system. Thomson is required to deliver to Lexis–Nexis once a month—or, upon request, more frequently—all citation information then included in the Auto–Cite system. Thomson also must supply Lexis–Nexis with identifying changes made in the citation information included in the Auto–Cite system and copies of all case information included in the system. Under the agreement, Lexis–Nexis has a right to use the data provided pursuant to an agreed upon payment schedule. The 1991 agreement was to be in effect until December 31, 1997, with additional automatic renewals for successive one-year terms. In March 1996 the parties agreed to extend the term of the Auto–Cite license through December 31, 2008. In anticipation of the West–Thomson merger, the parties also agreed that if Thomson conveyed or assigned Auto–Cite to anyone, it had to convey or assign "all or substantially all of the business and assets associated with the development, maintenance, and enhancement of the Auto–Cite product." Auto–Cite Licensing Agreement (as amended) ¶ 19.

Plaintiffs concluded that Lexis–Nexis needed Auto–Cite in order effectively to compete with Thomson/West in the comprehensive online legal research service market. Recognizing that Thomson's incentive to provide Auto–Cite might be substantially diminished after the merger, the Proposed Final Judgment as originally submitted to the Court provided for the divestiture of Auto–Cite and specifically established that the divestiture of Auto–Cite must include:

> the sale of all Auto–Cite trademarks and service markets, the assignment of the Auto–Cite License Agreement, and delivery of a transferrable royalty-free perpetual license of the Auto–Cite case database as of the time of the divestiture and all software, trade secrets, and know-how used in producing and updating the Auto–Cite case database.

Proposed Final Judgment (before revision) ¶ II.B.

Under this provision, Thomson must divest to an independent acquirer of Auto–Cite all the means necessary to be able to continue to offer Auto–Cite to Lexis–Nexis, other than new cases which the acquirer can get from a number of sources (including Lexis–Nexis and its parent, Reed Elsevier), without further help from, association with or payments to Thomson. The acquirer will get all the hardware, software, training, know-how, opportunity to employ editors, and trade name now associated with the product. In addition, the acquirer of Auto–Cite will obtain the historical Auto–Cite database with which to begin supplying Auto–Cite to its customers. The historical database will include every cross-cite to every ALR annotation in the database as of the day of the transfer, and the buyer will be able to continue to cite to ALR. The buyer of Auto–Cite will, of course, be able to update and improve Auto–Cite as it sees fit.

Furthermore, to assure the continued quality of Auto–Cite, the Proposed Final Judgment provides that the United States, after consultation with the state plaintiffs, must be satisfied that: (1) the acquirer of Auto–Cite can and will operate Auto–Cite as a viable, ongoing product; (2) the purchase is for the purpose of competing effectively in the sale of Auto–Cite; and (3) the acquirer has the managerial, operational and financial capability to compete effectively in the sale of Auto–Cite. In addition, the acquirer of Auto–Cite will be bound by the terms of the existing license between Thomson and Lexis–Nexis. Proposed Final Judgment ¶ IV.B.

Lexis–Nexis nevertheless argues that the Proposed Final Judgment does not effectuate a complete divestiture of Auto–Cite and that defendants should have been required to divest "all rights and interests" in Auto–Cite. It complains that in reality Thomson is

> not divesting itself of Auto–Cite at all: it is retaining the database itself, the staff trained in its use; the (apparently exclusive) right to use important elements of the system, i.e., the cross-references and integration with the ALRs and other Thomson products; and other important

incidents of ownership, such as the ability to sublicense.

Lexis–Nexis maintains that the Proposed Final Judgment "impairs Lexis–Nexis' contract rights to Auto–Cite, thus affirmatively damaging its ability to compete."

Lexis–Nexis' primary concern appears to be that because Thomson is retaining a copy of the Auto–Cite database, Thomson could use it to improve WestLaw, West's comprehensive online legal research service whose counterpart to Auto–Cite is called Insta–Cite.[15] While it is true that the consent decree permits Thomson to use its internal copy of the historical information contained on the existing Auto–Cite database to maintain and improve other Thomson/West products as well as for internal editorial purposes, Thomson will have no right and no access to the divested current Auto–Cite database and its enhancements, improvements and updates. Auto–Cite will become the sole property of another firm to develop, and that firm will be able to exclude others from using Auto–Cite and to license Auto–Cite to others as it wishes. Under the consent decree, Auto–Cite would become a service independent of Thomson and West in the hands of a buyer with the ability to "compete effectively" in the supply of the citator service to customers (including Lexis–Nexis). Proposed Final Judgment ¶ IV.B. Lexis–Nexis' fears therefore are unfounded. Furthermore, plaintiffs concluded that if Thomson does "upgrade" Insta–Cite, it would be a procompetitive, not an anticompetitive, result.

Lexis–Nexis has also claimed that under the consent decree the Auto–Cite database will not be sublicensable by its acquirer. Plaintiffs and defendants have repeatedly denied this assertion and stated that the acquirer will be able to do whatever the acquirer wants with the Auto–Cite database without fear of any interference from Thomson. In order to remove any doubt as to the sublicensability of the transferred Auto–Cite database, however, the parties now have proposed to add to Paragraph II.B. of the Proposed Final Judgment the word "subli-

censable" to the description of the license associated with the divested copy of the historical Auto–Cite database. *See supra* at 913.

Lexis–Nexis also maintains that divestiture of Auto–Cite should include divestiture of ALR. The government found, however, that Auto–Cite's primary value comes from its accurate, up-to-the-date display of case citations and whether or not a case is still good law, not from its cross-references to ALR. In addition, as discussed above, Thomson has an incentive to maintain and improve ALR, to sell ALR online, and to see that it is cross-referenced as often as possible. Therefore, Thomson's retention of ALR should have no negative effect on the quality of cross-cites to ALR on Auto–Cite or on Auto–Cite's continuing viability.

Finally, Lexis–Nexis contends that the proposed consent decree effectuates a taking of its property without compensation under the Fifth Amendment because the terms of the consent decree conflict with its current Auto–Cite License Agreement with Thomson. The License Agreement essentially requires that in order for Thomson to assign the Agreement, Thomson must either establish a successor to "all or substantially all of the business and assets associated with the Auto–Cite product" or obtain the consent of Lexis–Nexis.

Contrary to Lexis–Nexis' contention, the Court finds that the consent decree does not require Thomson to breach the Auto–Cite License Agreement. Thomson is required at a minimum to divest Auto–Cite in accordance with the provisions of the consent decree. If the License Agreement requires *more*, the consent decree certainly permits Thomson to fulfill those contractual obligations. If Lexis–Nexis still believes that it has not received the full benefit of its contract, it may pursue a contract remedy in an appropriate court. Thus, whether Thomson complies with its contract with Lexis–Nexis is a private contractual matter, not a potential takings issue. If Lexis–Nexis' contract with Thomson is breached, the breach will not be caused by

---

**15.** Insta–Cite offers only a portion of what Auto–Cite offers; it does not, for example, offer nega-

tive, indirect case history before 1972, nor does it offer cross-references to ALR.

the consent decree or by any actions by the plaintiffs or by this Court in entering the Final Judgment.

To give both Lexis–Nexis and the Court additional confidence that entry of the decree will not affect the parties' rights and interests under the Auto–Cite License Agreement, after the Tunney Act hearing the parties revised Paragraph II.B. of the Proposed Final Judgment to provide that assignment of Auto–Cite will be made if and only if permitted by the Auto–Cite License Agreement.[16] If not permitted, Thomson must transfer the economic benefits it receives under the Agreement (Lexis–Nexis' payment) to the buyer of Auto–Cite. In other words, the Proposed Final Judgment requires Thomson to assign the contract if it has the unilateral right to do so and provides Thomson with an alternative if it does not have such a right. If Lexis–Nexis persuades another court that Thomson as a contractual matter cannot assign Auto–Cite pursuant to the License Agreement, Thomson may fulfill its obligations under the contract and still comply with the consent decree. Nothing in the consent decree relieves Thomson of any of the obligations that it has undertaken in its License Agreement with Lexis–Nexis. Because it appears that Thomson is fully capable of meeting its obligations both under the decree and its License Agreement, the Court concludes that the Proposed Final Judgment does not give rise to a legitimate takings claim.

### E. The Star Pagination License

 West has long claimed a copyright in a page reference system it has developed called "star pagination." Star pagination is the insertion of symbols in the text of judicial decisions to indicate where internal page breaks occur in West's National Reporter System, and the placement nearby of the corresponding West reporter page numbers. Prior to the merger, West granted few, if any, licenses to employ star pagination to anyone other than Lexis–Nexis and has asserted copyright infringement claims against others. Complaint ¶ 32. As a condition of the merger, the government has required Thomson/West to grant a license to anyone who wants to star paginate to West's National Reporter System publications for a fee.[17]

As reflected throughout its complaint, the government was concerned that West's copyright claim and its refusal to issue any licenses would impede entry into the markets affected by the merger, particularly emerging electronic forms of enhanced primary law and secondary law products. *See* Complaint ¶¶ 32, 43, 52. In urging approval of the Proposed Final Judgment, the government now argues, however, that the mandatory licensing provision mitigates many of the anticompetitive effects of the merger and, indeed, increases the options available to competitors and potential competitors to Thomson/West in comparison with their pre-merger options. By contrast, Lexis–Nexis and many of the commentators maintain that the government should have required West to abandon its copyright claim altogether as a condition of the merger since it was a major anticompetitive factor in all three areas highlighted in the complaint.

West's copyright claim in star pagination is controversial and has been the subject of litigation. The United States has consistently maintained that the use by others of star pagination does not constitute copyright infringement, but some courts have ruled to the contrary. *See West Publishing Co. v. Mead Data Central, Inc.,* 799 F.2d 1219 (8th Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); *Oasis Publishing Co. v. West Publishing Co.,* 924

---

**16.** Paragraph II.B now provides in pertinent part:

> Auto–Cite is a Divestiture Product and its divestiture shall include the sale of all Auto–Cite trademarks and service marks, the assignment of the Auto–Cite License Agreement if permitted by contract or otherwise the transfer of the economic benefits equivalent to those received by Thomson under the Auto–Cite License Agreement, and delivery of a transferrable sub-

> licensable royalty-free perpetual license of the Auto–Cite case database as of the time of the divestiture and all software, trade secrets, and know-how used in producing and updating the Auto–Cite case database.

**17.** The Proposed Final Judgment contains the terms of the mandatory license, designated as Appendix B.

F.Supp. 918 (Minn.1996).[18] Judge John Martin of the United States District Court for the Southern District of New York recently rejected West's copyright claim. *See Matthew Bender & Co., Inc. v. West Publishing Co.,* 94 Civ. 0589 (JSM), 1996 WL 689412 (S.D.N.Y. Nov. 22, 1996).

Like Judge Martin, this Court has serious doubts about the continuing vitality of the Eighth Circuit's 1986 opinion in *Mead Data* in view of the subsequent decision of the Supreme Court in *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), and it finds unpersuasive the reasoning in *Oasis Publishing.* In rejecting the "sweat of the brow" doctrine of copyright, the Supreme Court emphasized that the *"sine qua non* of copyright is originality" and that only those components of a compilation that qualify as an "original work of authorship" can be copyrighted. *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. at 345, 357, 111 S.Ct. at 1287, 1293–94. The "selection, coordination and arrangement" of a set of facts can be copyrighted only if they are "sufficiently original to merit protection." *Id.* at 358, 111 S.Ct. at 1294. Thus, in order to prevail on its star pagination copyright claim, West would have to demonstrate that its reporter page numbers and their placement themselves represent an original, creative decision about selection or arrangement, a "thin" copyright claim at best. *Id.* at 349, 111 S.Ct. at 1289. As Judge Martin put it, "where and on what pages the text of a court opinion appears does not embody any original creation of the compiler.... [S]tar pagination does not in any way take advantage of that part of West's effort in making the compilation that reflects its intellectual effort. It simply ... reflects the accident of where a particular portion of an opinion ended up in a West reporter." *Matthew Bender & Co., Inc. v. West Publishing Co.,* 94 Civ. 0589 (JSM), Transcript at 35 (S.D.N.Y. Nov. 22, 1996).

Like many of the commentators, the Court is concerned that including the star pagination license provision in the Final Judgment might be construed as an endorsement by the government or by the Court of West's dubious copyright claim. While as plaintiffs point out, the Proposed Final Judgment expressly states that the license provisions will have no formal bearing, in any forum, on West's intellectual property claim or on the government's right to challenge it, the consent decree does legitimize Thomson/West's ability to profit from the licenses for use of star pagination while the copyright issue is litigated in the Second and Eighth Circuits and, in all likelihood, before the Supreme Court.[19] That fact alone is troublesome in view of the weakness of West's claim and the limited market power of many of those who must pay the license fee, particularly now that the most economically powerful critic of West's position, Thomson, has lost its incentive to contest the claim and joins West in advancing it.[20]

---

**18.** The United States recently filed briefs arguing against West's copyright claim in *Matthew Bender & Co., Inc. v. West Publishing Co.,* 94 Civ. 0589 (JSM) (S.D.N.Y.) and *Oasis Publishing Co. v. West Publishing Co.,* No. 96–2887 (8th Cir.).

**19.** The following language was added to the Proposed Final Judgment to emphasize the government's view that entry of the consent decree should have no bearing on the parties' respective positions with respect to West's copyright claim:

[D]efendants acknowledge that plaintiffs' consent to the entry of this decree should not be read to suggest that plaintiffs believe that a license is required before a legal publisher may star paginate to defendants' products and that plaintiffs expressly reserve the right to assert their views concerning the extent, validity, or significance of any intellectual property right claimed by defendants, in judicial proceedings or in any other forum. Plaintiffs and defendants further agree that this Final Judgment shall have no impact whatsoever on any adjudication concerning these matters. Defendants have agreed that they will not use the model license contained in this Final Judgment, or the fact that any such license was included in the Final Judgment, in any litigation or negotiations with third parties to support the validity of their position on star pagination.

Proposed Final Judgment at 2–3.

**20.** The Final Judgment as originally proposed to the Court exacerbated the problem by requiring that those who enter into star pagination licenses with Thomson/West refrain from challenging the copyright, at least during the pendency of the license. This provision was eliminated after the Tunney Act hearing.

Thomson and West maintain that West's star pagination copyright claim is not itself a Clayton Act violation, that the government could not have obtained any concessions with respect to it at a trial of this case, including relief in the form of a mandatory license of the kind embodied in the Proposed Final Judgment, and that the claim is unrelated to the merger. From these propositions, they reason that the Court's public interest inquiry should be limited to whether the license agreement has a negative impact on the public or on competitors in comparison to the status quo ante and that the impact of the mandatory licensing provision is a positive one. *See* Defendants' Response to Public Comments at 26–27. This contention must fail.

First, defendants' assertion that star pagination could never be deemed an antitrust violation or is unrelated to the merger is belied by the government's repeated, indeed pervasive references to the anticompetitive effects of star pagination throughout the complaint. It was clearly a major concern of the government's with respect to each of the markets effected by the proposed merger. Second, the Court is not limited to considering the immediate anticompetitive effects of a proposed merger but may also anticipate future anticompetitive practices and impacts in approving relief. *See United States v. AT & T*, 552 F.Supp. at 150 n. 80. Finally, the star pagination license is an essential part of the consent decree before the Court—negotiated by the parties as a remedy for the anticompetitive impacts of the merger—and therefore necessarily is subject to review. Whether this precise relief might or might not have been obtained at trial is irrelevant. Just as the Court may not second guess the government's choices about what claims to bring in the first place, it should not treat differently those concessions proposed in a consent decree that might have been achieved at trial from those that might not have been achievable. *See United States v. Microsoft Corp.*, 56 F.3d at 1459. The Court has the authority and the obligation to carefully scrutinize all the remedies contained in the consent decree before it, including in this case the star pagination license provision, no matter how they got there.[21]

One of the most disturbing aspects of the licensing arrangement has been cured as a result of this proceeding. At the September 30 hearing, the Court expressed skepticism about the requirement originally contained in the proposed license agreement that a licensee give up its right to challenge West's copyright infringement claim. The Court articulated its reluctance to place its judicial imprimatur upon such a rights chilling provision. Near the conclusion of the hearing, Thomson offered to eliminate the prohibition and plaintiffs subsequently agreed to incorporate this offer into the Final Judgment.[22] Thus, as now before the Court, the consent decree contains no prohibition on a licensee challenging West's star pagination copyright even while it has a star pagination license.

The consent decree still fails to address the assertions expressed throughout the com-

---

**21.** On a related issue, Geronimo Development Corporation argued that the star pagination licensing remedy is beyond the scope of the complaint because it encompasses the licensing of page numbers from the *Federal Reporter* and *Federal Supplement* series case reports, published by West. The complaint does not address the market for lower federal court enhanced case law because the government found insufficient evidence to allege that Thomson is an actual potential or perceived potential competitor to West's alleged monopoly in enhanced lower federal court case law.

Even if Geronimo were correct in its assertion that lower federal court enhanced case law is irrelevant to the star pagination issue, an assertion not at all obvious to the Court, the government was well within its authority to include such case law in the license. As plaintiffs explain, inclusion of the entire West Reporting System in the star pagination license was necessary and appropriate to allow potentially entering firms the maximum flexibility in shaping their new or improved products, particularly in the secondary law product markets. While the Court is not authorized to inject new issues into the case, there is nothing in the *Microsoft* opinion to suggest that there is any limitation on the issues that the *government* may raise in its negotiations.

**22.** To effect the revision, Paragraph 3.01 to Exhibit B of the Final Judgment, the star pagination license, has been amended to delete the clause, "(i) shall respect and not contest the validity of the copyrights claimed by Licensor in Licensor's arrangements of case reports in NRS Reporters as expressed by NRS Pagination; and (ii)."

plaint that West's copyright claim to star pagination itself is a barrier to entry in the markets for primary enhanced law products and secondary law products and the online legal research market. The complaint alleges that "[b]ecause citations to the National Reporter System are commonly required or expected by courts, and thus sought by users, West's [star pagination] copyright claim chills potential entry into the[ ] markets" for primary enhanced law products and secondary law products, particularly CD–ROMs, as well as, at least indirectly, online research. Complaint ¶¶ 32, 43, 52. With the consolidation of the formidable resources of West and Thomson in all three of these areas, the government was rightly concerned that star pagination and West's copyright claim might significantly impede access to the text of court decisions, discourage the publication of secondary law products and hamper competition in the print, CD–ROM and online research services markets. Even if West's copyright claim were legally pristine, the government would have been justified in its fear that the merger of these two publishing giants in conjunction with West's asserted star pagination copyright would chill entry into the legal publishing markets identified in the complaint. The Supreme Court's decision in *Feist*, however, casts a long shadow over defendants' legal claim, rendering the maintenance of these barriers even more suspect.

Plaintiffs argue that the license agreement is a sufficient remedy for the anticompetitive effects of star pagination because it erects no further barriers to competition or to the litigation of the copyright claim than previously existed and provides a new option never before available. Publishers can still star paginate without a license and litigate the validity of the copyright claim, as they could before the merger, or they may accept a new entry option they would not otherwise have and

have never had before, the right to use star pagination without fear of legal challenge by paying for a license at rates that plaintiffs claim are low enough to reduce barriers to entry into the markets identified in the complaint. The Court is not persuaded by this argument. The very fact that the consent decree authorizes Thomson/West to charge money for the use of star pagination (albeit less money than West previously charged Lexis–Nexis) while its dubious copyright claim is being litigated raises public interest concerns. For small publishers, the cost of such a license could well make the difference between entry into the market and exclusion, particularly in view of the provision in the license that requires the payment of a separate license fee for each format—books, CD–ROM, online or the Internet—which several commentators have argued will erect even greater barriers to potential entrants. *See, e.g.*, Public Comments of James P. Love, Consumer Project on Technology; Public Comments of Oasis Publishing Co., Inc.

The licensing remedy proposed by the parties has two distinct aspects: the mandatory nature of the license, namely, that Thomson/West must issue it to anyone who asks, and the level of the fees.[23] The Court agrees with the parties that the mandatory nature of the license cures the concerns raised in the complaint that West has refused to issue such licenses in the past, that the inability to use star pagination is itself a significant barrier to entry into the relevant markets, and that the denial of such licenses threatens publishers with intensive and expensive litigation if they employ star pagination without a license. With the mandatory star pagination license, any publisher can include star pagination in its publications and refer to the West National Reporter system as is so commonly required by courts and practitioners. *See* Complaint ¶¶ 32, 43, 52. Furthermore,

**23.** In seeking approval of the star pagination license provision, the parties argue that the fees are reasonable, that they were even further reduced in the course of negotiations, and that they are far less than the fees charged to Lexis–Nexis. The fees per thousand characters contained in the Proposed Final Judgment as now proposed to the Court are as follows:

| | |
|---|---|
| 1st year of a license | 4 cents |
| 2nd year of a license | 4 cents |
| 3rd year of a license | 6 cents |
| 4th year of a license | 6 cents |
| 5th year of a license | 8 cents |
| 6th year of a license | 8 cents |
| 7th year of a license | 9 cents |
| Subsequent years | 9 cents |

Proposed Final Judgment ¶ IX.A.

these publishers are protected from litigation initiated by Thomson/West but still can, if they choose, challenge the validity of the copyright while using the license to preserve their ability to compete. These features of the license preserve and may even enhance the ability of competitors to challenge the copyright claim. Accordingly, on balance, the Court finds this aspect of the license to be in the public interest.[24]

The same cannot be said for the proposed fee schedule or, indeed, for any fee schedule. The asserted reasonableness of the proposed fees does not resolve the overarching problem that the establishment of a court-approved fee schedule gives Thomson/West permission to profit from its dubious copyright claim while maintaining by court order significant barriers to entry into the relevant markets identified in the complaint by smaller publishers, particularly in the CD–ROM market. A pervasive theme of the complaint is that star pagination impedes entry into the relevant markets by potential competitors, Complaint ¶¶ 32, 43, 52, and the government has conceded that the mandatory license only "reduces, does not eliminate, but reduces [the] barrier ... [to] entry into the secondary law and enhanced primary law markets." Tunney Act Hearing Tr. at 27. Whether the cost of entry is the result of litigation over the star pagination copyright or the payment of fees for the right to use star pagination, it still constitutes a barrier to entry in the markets identified in the complaint and, for most potential competitors, an extremely costly one.

The star pagination license agreement and fee schedule do not effectively remedy the anticompetitive effects of the merger alleged in the complaint. Nor do they satisfactorily answer the concern that the license agreement puts the Court's imprimatur on West's copyright claim. The license agreement places the cost of the star pagination copyright dispute squarely on those with the better of the legal argument after *Feist* and primarily on the shoulders of small publishers who will have to continue to pay, either via licensing fees or litigation, for access to star pagination.[25] Since this lawsuit was filed precisely because the Department of Justice concluded that the merger of Thomson and West would harm competition in markets in which it is already difficult for small publishers to flourish, in the circumstances the Court must conclude that the licensing fee provision is not a sufficient remedy for the allegations of the complaint.

If the new Thomson/West entity wishes to preserve its ability to maintain and pursue West's copyright claim, it should bear the costs of doing so. It is not appropriate for West to profit from the pursuit of its claim until it is judicially resolved and for potential competitors to the new merged company, primarily small publishers, to effectively finance the litigation. The Court cannot conclude that it is in the public interest for the costs of litigation to be shifted to small publishers and for the Court to sanction this cost-shifting based entirely on a copyright claim that is dubious at best. *See United States v. AT & T*, 552 F.Supp. at 151; *see id.* at 151 n. 83. In view of the many third parties that contend that they will be injured by such a judicially-approved license, the Court cannot "assum[e] that the decree is appropriate." *United States v. Microsoft Corp.*, 56 F.3d at 1462. While West certainly may maintain its legal claim and continue to litigate it in the Second and Eighth Circuits and in the Supreme Court, this Court will not require others to pay for a license for the right to use star pagination and suffer the

---

24. The Court also finds no problem with the clarity or enforceability of the proposed remedy. *See United States v. Microsoft Corp.*, 56 F.3d at 1461. One commentator claimed that the proposed star pagination license is ambiguous as to the license fee to be charged for books. Plaintiffs state clearly, however, that the fee would be paid by the licensee in the year the book is printed so that books first printed, then stored, and sold in later years would not require additional fee payments for the later years. In order to avoid any confusion, the parties have agreed to modify the

License Agreement so that it reads: "the license fee for [print Licensee Product(s)] need only be paid for the year in which the [print Licensee Product(s)] are printed." Proposed Final Judgment, Ex. B, Section 2.03.

25. Presumably, Lexis–Nexis is competitively able to absorb these fees since they will be less than the fee schedule previously negotiated between Lexis and West.

anticompetitive consequences in the meantime. The Court is forced to conclude that the licensing fee provision and thus the Proposed Final Judgment are beyond "the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d at 1460.[26]

The Court suggests that the public interest would be served if West and Thomson would agree to amend the license provisions in the Proposed Final Judgment and in Exhibit B to provide a free license to all who request one until West's copyright claim is judicially resolved once and for all. Under such a licensing agreement, Thomson/West may continue to litigate the matter at its own expense, while the barriers to market entry for competitors and potential competitors will be reduced by permitting others to use star pagination without having to pay either a fee or the costs of litigation. The only difference between that solution and the one proposed in the consent decree would be that the Court and the Department of Justice would not be extending their approval to the shifting of costs to small publishers based on a legal claim of which the Court is deeply suspicious and which the Department of Justice vehemently opposes.

\* \* \*

By contrast with the star pagination license issue, several commentators complained that West's asserted copyright in

star pagination is inextricably linked to West's asserted copyright in the text of judicial opinions themselves. *See, e.g.,* Geronimo Public Comment at 3–5. While it is obvious to this Court that neither West nor anyone else has a legitimate copyright claim to a judge's or a court's opinions, it is equally apparent that to the extent that West asserts a copyright in the public domain text of judicial opinions, such a claim was not deemed relevant to the merger and thus was not addressed by the government in its complaint against West and Thomson. It therefore would be inappropriate for the Court to consider this issue in its Tunney Act public interest determination. *United States v. Microsoft Corp.*, 56 F.3d at 1460.[27]

Other commentators believe that the star pagination license should include a mandatory text license and a waiver of any copyright claims on intermediate copying so long as any published case does not include West headnotes and summaries. These arguments rely mainly on the proposition that the text of judicial opinions is difficult to obtain and that Thomson will now benefit from West's control over such text. While the availability of the text of judicial opinions is necessarily of concern, it is not part of the complaint in this action and therefore the concerns of these commentators are also beyond the scope of this proceeding.[28]

---

**26.** The public commentators almost universally would have the Court eliminate the star pagination license agreement altogether and force West to abandon its copyright claim as a quid pro quo for approval of the merger. While it is certainly open to West/Thomson to abandon the copyright claim, it would be inappropriate for the Court to make an implicit determination on the merits of West's claim. While there may be circumstances under which courts are justified in requiring companies to relinquish legal claims or forego other benefits or entitlements under the Tunney Act public interest review provisions, *see United States v. AT & T*, 552 F.Supp. at 217, this Court will not go so far.

**27.** Matthew Bender comments that it believes that West further claims "a copyright interest in the initial parallel citations (*i.e.*, the cite to the first page of a case) in the National Reporter System that may be infringed when a competitor uses such citations." The governments' investigation revealed that West does claim such a copyright interest but concedes that third party

use of such citations is a fair use and that such citations therefore are "effectively in the public domain." *See* Defs.' Response to Public Comments at 26 n. 27 (use of first page citations is "fair use"). Furthermore, West has never sought to enforce such a copyright interest, and defendants have stated that they have no intention of attempting to do so in the future.

**28.** Others commented that Thomson/West should be required to agree not to assert future database protection legislation and anti-RAM copying claims against licensees, for use of star pagination. This issue is specifically addressed in the proposed license in Exhibit B. The proposed license ensures that Thomson/West will not contend that a licensee's use of star pagination infringes *any* intellectual property right. Section 2.01 also provides that "Licensor [Thomson] shall not challenge, under any present *or future legislation*, any use by the Licensee of Licensed NRS Pagination if Licensee's use of same conforms to the terms of this Agreement." (emphasis added).

A number of commenters further maintain that the star pagination license should not require licensees to disclose competitive product information to Thomson/West in order to obtain a star pagination license. As the parties pointed out, however, the license does not require the disclosure of detailed information. Rather, Section 1.03 merely requires licensees to provide to defendants a short, general description of the licensee's product or service to defendants in order to make it clear what product is covered by the license. The license also must disclose what cases are included in the product so that the license fee can be calculated. This information, however, should not be considered sensitive competitive information, as the cases selected by the licensee for publication will subsequently be public information.

Finally, some commentators believe that third party information providers should be able to sell or license case law data that include licensed star pagination and text so long as the purchasers or licensees have entered into or are subject to a pagination license agreement with Thomson/West. Section 2.02 of the license provides that

> nothing in this Agreement shall prohibit Licensee from selling, leasing, licensing or otherwise transferring Licensee Case Reports that contain Licensed NRS Pagination to third party information providers, but such transfers shall not include or grant any right to reproduce, publish, broadcast, distribute, loan, rent, lease, sell or otherwise transfer, make available or use the Licensed NRS Pagination contained in such Licensee Case Reports.

Nevertheless, to clarify that the license fee need only be paid by the publisher, and not also by the third party information provider, the parties have agreed to the following language:

> 2.01. *Star Pagination License.* During the term of this Agreement, ... Licensor hereby grants to Licensees ... a non-exclusive, non-transferable ... limited license ... (iv) to have a third party obtain, on behalf of Licensee, NRS Pagination from West Case Reports contained in NRS Reporter publications and include such NRS Pagination (which shall become Li-

> censed NRS Pagination when so included) in corresponding Licensee Case Reports contained in [Licensee Product(s)/Service(s) ].

This additional language adequately addresses any potential concerns about clarity that might exist.

## III. CONCLUSION

Before the Court can find the Proposed Final Judgment to be in the public interest, the parties will have to modify it to cure the defects caused by the star pagination licensing fee schedule. The Court has suggested how this may be done to its satisfaction. In deference to the fact that a consent decree is the result of a negotiated settlement between parties to a lawsuit, of course the parties may propose any alternative remedy or combination of remedies that adequately address the Court's concerns. An Order consistent with this Opinion shall be entered this same day.

SO ORDERED.

### *ORDER*

This case is before the Court pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16 (the "Tunney Act"), for a determination of whether the consent decree presented in the form of a Proposed Final Judgment proposed by the United States Department of Justice, the state plaintiffs, The Thomson Corporation and West Publishing Company is in the "public interest." Having carefully considered the many briefs and other materials submitted by the parties and *amicus curiae*, the 26 public comments submitted to the Department of Justice, the responses thereto, and the arguments presented in open court, and for the reasons stated in the accompanying Opinion issued this same day, the Court finds that the Proposed Final Judgment as revised is in the public interest but for the star pagination license provision contained in Paragraph IX and in Exhibit B. Accordingly, it is hereby

ORDERED that plaintiffs' Motion for Entry of the Proposed Final Judgment is DENIED; and it is

FURTHER ORDERED that in view of the Court's Opinion the parties may submit a revised Proposed Final Judgment with an appropriate motion at their earliest convenience.

SO ORDERED.