UNITED STATES of America,
Plaintiff,

v.

SBC COMMUNICATIONS, INC.
and Bellsouth Corporation,
Defendants.

No. CIV.A. 00–2073(PLF).

United States District Court,
District of Columbia.

Oct. 13, 2004.

Hillary B. Burchuk, U.S. Department of Justice, Washington, DC, for Plaintiff.

*MEMORANDUM OPINION
AND ORDER*

PAUL L. FRIEDMAN, District Judge.

## I.  BACKGROUND

This case originally arose from a proposal by defendants SBC Communications, Inc. (" SBC") and Bellsouth Corporation (" Bellsouth") to form a joint telecommunications venture that would ultimately become Cingular Wireless LLC (" Cingular"). On August 30, 2000, plaintiff commenced an antitrust action in this Court, based on concerns that the proposed transaction would result in undue concentration of market share in

markets for wireless telephone service in California, Indiana, and Louisiana, and would substantially lessen competition there. A Final Judgment entered by this Court on December 29, 2000, with the consent of the parties, required defendants to make divestitures of certain spectrum licenses and other assets in those markets before the transaction could be consummated. It also bars defendants from reacquiring any of the divested spectrum licenses until December 29, 2010.

Some of the spectrum licenses divested in California and Louisiana were subsequently purchased by AT & T Wireless, a company that Cingular agreed to acquire on February 17, 2004. As the Final Judgment's bar to Cingular's ownership of the divested licenses would interfere with the proposed acquisition, the parties jointly moved on August 11, 2004, for modification of the Final Judgment of December 29, 2000, to allow Cingular to reacquire the licenses that had been purchased by AT & T Wireless.

On August 12, 2004, the Court issued an order establishing procedures for modification of the Final Judgment. Pursuant to that order, Bellsouth and SBC would at their own expense publish notice of the proposed modification in three newspapers, and the government would publish a notice in the *Federal Register*. A 30–day notice and comment period would follow, after which plaintiff would file any comments received and its responses with the Court. *See* Order to Establish Procedures For Motion to Modify Final Judgment.

This procedure having been followed, and plaintiff having affirmed its assent to modification of the Final Judgment, the Court now considers the parties' Joint Motion to Enter an Order Modifying Final Judgment.

## II. ANALYSIS

### 1. Public Interest Determination

Under the Tunney Act, the Court must make an independent determination of whether a consent decree, judgment, or modification thereof is in the public interest. *See* 15 U.S.C. §§ 16(b)-(h); *United States v. Western Electric Co.*, 993 F.2d 1572, 1576 (D.C.Cir.1993). Under the " public interest test" as applied in the D.C. Circuit, the Court is to approve uncontested modifications if the resultant arrangement is " within the *zone of settlements* consonant with the public interest today." *Id.* (*quoting United States v. Western Electric Co.*, 900 F.2d 283, 307 (D.C.Cir.1990) (emphasis in original)).

The Court's public interest review, however, does not extend beyond the concerns raised in the original complaint:

> [T]he court is to compare the complaint filed by the government with the proposed consent decree and determine whether the remedies negotiated between the parties and proposed by the Justice Department clearly and effectively address the anticompetitive harms initially identified. In other words, the court " may not reach beyond the complaint to evaluate claims that the government did *not* make."

*United States v. The Thomson Corp.*, 949 F.Supp. 907, 913–14 (D.D.C.1996) (*quoting United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C.Cir.1995) (emphasis in original)). Here, the original complaint focused on the increased concentration of market share in the affected markets (and a resulting rise in prices and decrease in service quality) if the Cingular joint venture were allowed to proceed. Complaint ¶¶ 17–22. It was these concerns that motivated the divestiture requirements embodied in the original Final Judgment.

### 2. Public Comment on the Proposed Modification

■ Specific objections from third parties, and the degree to which the consenting parties address them in their motion for modification, are an important factor to be considered in making the public interest determination. *See United States v. The Thomson Corp.*, 949 F.Supp. at 914.

■ Only one member of the public responded during the 30–day notice and comment period. Mr. Dennis Moore, a former employee of Cingular Wireless, submitted a two page letter with attachments. *See* Response of Plaintiff United States to Public Comment on the Proposed Modified Final Judgment, Ex. 1. Mr. Moore's submission, however, does not concern the impact on competition of any modification of the Final Judgment and does not deal with the antitrust concerns at issue in this case at all. Rather, it consists of a copy of a letter sent by Mr. Moore to the Chairman of the Federal Communications Commission on March 17, 2004 (several months before the notice and comment period on the proposed modification commenced), discussing Mr. Moore's personal allegations of employment discrimination by Cingular. The 42–pages of attachments to Mr. Moore's letter consist only of news articles about the proposed acquisition of AT & T Wireless by Cingular and documents related to an employment discrimination lawsuit filed by Mr. Moore against Cingular in the United States District Court for the Northern District of Illinois.

The matters raised by Mr. Moore's comments are unrelated to the anticompetitive concerns of the original antitrust complaint and are consequently outside the scope of this proceeding. *See United States v. The Thomson Corp.*, 949 F.Supp. at 913–14. The results of the notice and comment period therefore give the Court no reason to deny modification of the Final Judgment if the modification is otherwise in the public interest.

### 3. The Government's Public Interest Finding

In the Joint Motion to Modify Final Judgment, the government explains its reasons for consenting to the modification. Under the original Final Judgment, divestitures were required to assuage concerns that the Cingular joint venture would result in undue concentration in wireless markets in Indiana, Louisiana, and California. *See* Memorandum of the United States in Support of Joint Motions to Modify Final Judgment and to Establish Procedures to Modify Final Judgment at 2. Since the entry of the Final Judgment, however, the competitive conditions for wireless mobile telephone services in the Los Angeles and Indianapolis markets have changed. More wireless carriers have begun operation in the Indiana and California markets, and defendants' market share in those markets has fallen by at least 5 to 10 percent. *See id.* at 8–9. According to the government, after the Cingular/AT & T Wireless acquisition, the combined firm would have at least 20% less market share in the Los Angeles area than defendants had at the time of the entry of the Final Judgment, and would face competition from four other facilities-based competitors who continue to increase their number of subscribers. *See id.* at 9–10. AT & T Wireless has also agreed to take measures to reduce the concentration of market share in Indiana should the requested modification be allowed. *See id.* at 10–11. Consequently, the government maintains, " the original Final Judgment's bar on reacquisition of the divested spectrum licenses in California and Indiana is no longer necessary to ensure the competitive operation of the marketplace." *Id.* at 11–12.

## III. CONCLUSION

To approve the modification, the Court must determine whether the proposed modification is within the " zone of settlements consonant with the public interest." *United States v. Western Electric Co.,* 993 F.2d at 1576. The procedure set out in this Court' s Order of August 12, 2004, has been followed. The government' s factual proffer concerning changes in the relevant markets and its public interest analysis are persuasive. It has adequately responded to the lone public comment filed in the notice and comment period—a comment unrelated to anticompetitive concerns. Furthermore, nothing in the history of the case or the parties' filings gives the Court any reason to question the government' s finding that the proposed modification is in the public interest.

The Court therefore finds that the proposed modification of the existing · Final Judgment is ·in the public interest. Accordingly, it is hereby

ORDERED that plaintiff' s Motion to Enter Order Modifying Final Judgment [21] is hereby GRANTED; and it is hereby

ORDERED that the parties' Joint Motion to Modify Final Judgment [14] is DENIED as moot.

An Order to Modify Final Judgment and a Modified Final Judgment consistent with this Memorandum Opinion shall issue this same day.

SO ORDERED.

### *ORDER TO MODIFY FINAL JUDGMENT*

The Court having received the joint motion of Defendants, SBC Communications Inc. and BellSouth Corporation, and Plaintiff, United States, for modification of the Final Judgment entered in this case· on December 29, 2000, and the United States having represented to the Court that it has no objection to the motion, and notice of the motion having been published in the *Federal Register, The Los Angeles Times, The Indianapolis Star,* and *RCR Wireless News,* and all interested parties having been given an opportunity to submit comments concerning the proposed modification of the Final Judgment, and the Court having considered all papers and comments filed in connection with this motion and the United States response to those comments, and the Court finding that it is in the public interest to modify the Final Judgment, it is

**ORDERED, ADJUDGED, AND DECREED:**

. That· Sections XI and XIII are hereby modified to read as follows:

### XI

#### No Reacquisition

A. Defendants may not reacquire any part of the spectrum licenses issued by ·the Federal Communications Commission ("FCC") and all other licenses, permits and authorizations divested pursuant to this Final Judgment in the MSAs· and RSAs listed in Section II.D.I and the following BTAs within the Indianapolis MTA listed in Section II. D.II.B: BTA 015 Anderson, IN; BTA 039 Muncie, IN; BTA 373 Richmond, IN; BTA 442 Terre Haute, IN; and BTA 457 Vincennes–Washington, IN ("Restricted BTAs"), provided, however, the divested spectrum licenses in the Restricted BTAs may be reacquired in connection with the proposed Cingular/AT & T Wireless Acquisition if the conditions in Subsection B are met.

B. Defendants may reacquire the divested spectrum in the Restricted BTAs if they do not also acquire as a result of the Cingular/AT & T Wireless Acquisi-

tion any interest (equity, financial, or otherwise) in, any ability to exercise control over, or any right to use the spectrum covered by the Partnership Licenses in any of the Restricted BTAs, except as noted below. In furtherance of this, defendants shall:

1. Provide to plaintiff for its approval, in its sole discretion, copies of all agreements entered into by the defendants or AT & T Wireless with the owners of the Partnership Licenses, including amendments to the existing agreements between AT & T Wireless and Von Donop, so that plaintiff will have the opportunity to review them before this Final Judgment is modified. No term shall be included in said agreements or amendments that would in any way limit Von Donop's ability to make the spectrum covered by the Partnership Licenses available to other users. The agreements may be contingent on the closing of the Cingular/AT & T Wireless Acquisition;

2. Not acquire, directly or indirectly, any rights to influence or control how the Partnership Licenses are used, sold or leased, nor shall defendants and AT & T Wireless have any control over the identity of any purchasers or lessees, or the price or any other terms and conditions of sale or lease;

3. Be prohibited from acquiring any managerial, administrative, financial or legal interest in the Partnership Licenses or entering into any arrangement that allows them

to use the Partnership Licenses; and

4. Notify plaintiff 30 days before the implementation of any changes in the relationship between defendants or AT & T Wireless and Von Donop.

The defendants may retain a limited interest in the proceeds of any sale or lease of the Partnership Licenses, provided that (1) such interest influences neither whether the Partnership Licenses are sold or leased nor the terms on which they are offered and (2) such interest is capped at the total amount of debt incurred by Von Donop in acquiring the Partnership Licenses and any tax consequences to Von Donop from the agreements referenced in Subsection B.1.

Any breach of these conditions by defendants, while defendants own, operate, or control any of the reacquired licenses in the Restricted BTAs shall violate this Final Judgment.

C. For purposes of Section XI, the following definitions will apply:

1. "AT & T Wireless" means AT & T Wireless Services. Inc., its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

2. "Cingular/AT & T Wireless Acquisition" means the proposed acquisition of AT & T Wireless by SBC/BellSouth Wireless Joint Venture encompassed in The Agreement and Plan of Merger dated February 17, 2004.

3. "Partnership Licenses" means the following spectrum licenses issued by the FCC:

| Call Sign | Market | Channel Block | MHz | Frequencies |
| --- | --- | --- | --- | --- |
| WPOK609 | BTA015– | C | 30 | 1895.00–1910.00 |

| | | | | |
|---|---|---|---|---|
| Anderson, IN | | | | 1975.00–1990.00 |
| WPOK648 | BTA309– | C | 30 | 1895.00–1910.00 |
| Muncie, IN | | | | 1975.00–1990.00 |
| WPOK655 | BTA373– | C | 30 | 1895.00–1910.00 |
| Richmond, IN | | | | 1975.00–1990.00 |
| KNLF314 | BTA442– | C1 | 15 | 1902.50–1910.00 |
| Terre Haute, IN | | | | 1982.50–1990.00 |
| KNLF305 | BTA457– | C1 | 15 | 1902.50–1910.00 |
| Vincennes–Washington, IN | | | | 1982.50–1990.00 |

4. "Von Donop" means Von Donop Inlet PCS, LLC, its owners, partners, successors, and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees, including but not limited to its successors or assigns related to the Partnership Licenses.

. . . . .

## XIII

### Expiration of Modified Final Judgment

Unless this Court grants an extension, this Modified Final Judgment shall expire on the tenth anniversary of the entry of the original Final Judgment, December 29, 2000.

*MODIFIED FINAL JUDGMENT*

WHEREAS, plaintiff, United States of America, filed its Complaint on August 30, 2000;

AND WHEREAS, plaintiff and defendants, by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication on any issue of fact or law;

AND WHEREAS, entry of this Final Judgment does not constitute any evidence against or an admission by any party with respect to any issue of law or fact;

AND WHEREAS, defendants have further consented to be bound by the provisions of the Final Judgment pending its approval by the Court;

AND WHEREAS, plaintiff believes that entry of this Final Judgment is necessary to protect competition in markets for mobile wireless telecommunications services in California, Indiana, and Louisiana;

AND WHEREAS, the essence of this Final Judgment is prompt and certain divestiture of certain wireless businesses that would otherwise be commonly owned and controlled, including their licenses and all relevant assets of the wireless businesses, and the imposition of related injunctive relief to ensure that competition is not substantially lessened;

AND WHEREAS, plaintiff requires that defendants make certain divestitures of such licenses and assets for the purpose of ensuring that competition is not substantially lessened in any relevant market for mobile wireless telecommunications services in California, Indiana, and Louisiana;

AND WHEREAS, defendants have represented to plaintiff that the divestitures ordered herein can and will be made and that defendants will not raise any claims of hardship or difficulty as grounds for ask-

ing the Court to modify any of the divestiture provisions contained herein below;

THEREFORE, before the taking of any testimony, and without trial or adjudication of any issue of fact or law herein, and upon consent of the parties hereto, it is hereby ORDERED, ADJUDGED and DECREED:

# I

## Jurisdiction

This Court has jurisdiction over the subject matter of this action and of each of the parties consenting to this Final Judgment. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended.

# II

## Definitions

A. "SBC" means SBC Communications Inc., a corporation with its headquarters in San Antonio, Texas, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

B. "BellSouth" means BellSouth Corporation, a corporation with its headquarters in Atlanta, Georgia, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

C. "Wireless System Assets" means, for each wireless business to be divested under this Final Judgment, all types of assets, tangible and intangible, used by defendants in the operation of each of the wireless businesses to be divested (including the provision of long distance telecommunications services for wireless calls; however, paging services are not included in the definition of Wireless System Assets). "Wireless System Assets" shall be construed broadly to accomplish the complete divestiture of the entire business of one of the two wireless businesses in each of the Overlapping Wireless Markets required by this Final Judgment and to ensure that the divested wireless businesses remain viable, ongoing businesses. With respect to each overlap in the Overlapping Wireless Markets, the Wireless System Assets to be divested shall be either those in which BellSouth has an interest or in which SBC has an interest, but not both. The divestitures of the Wireless System Assets as defined in this Section II.C shall be accomplished by: (i) transferring to the purchaser the complete ownership and/or other rights to the assets (other than those assets used substantially in the operations of either defendant's overall wireless business that must be retained to continue the existing operations of the wireless properties defendants are not required to divest, and that either are not capable of being divided between the divested wireless businesses and those that are not divested or are assets that the divesting defendant and the purchaser(s) agree shall not be divided); and (ii) granting to the purchaser(s) an option to obtain a non-exclusive, transferable license from defendants for a reasonable period at the election of the purchaser to use any of the divesting defendant's assets used in the operation of the wireless business being divested, so as to enable the purchaser to continue to operate the divested wireless businesses without impairment, where those assets are not subject to complete transfer to the purchaser under (i). Assets shall include, without limitation, all types of real and personal property, monies and financial instruments, equipment, inventory, office furniture, fixed assets and furnishings, supplies and materials, contracts, agreements, leases, commit-

ments, spectrum licenses issued by the Federal Communications Commission ("FCC") and all other licenses, permits and authorizations, operational support systems, customer support and billing systems, interfaces with other service providers, business and customer records and information, customer lists, credit records, accounts, and historic and current business plans, as well as any patents, licenses, sub-licenses, trade secrets, know-how, drawings, blueprints, designs, technical and quality specifications and protocols, quality assurance and control procedures, manuals and other technical information defendants supply to their own employees, customers, suppliers, agents, or licensees, and trademarks, trade names and service marks (except for trademarks, trade names and service marks containing "SBC," "Southwestern Bell," "Pacific Bell," "Ameritech," "Cellular One," "1–800–Mobile–1," "ClearPath," "Pick–Up and Go," "BellSouth," "Bell," the Bell Symbol, or "Mobile Memo") or other intellectual property, including all intellectual property rights under third party licenses that are capable of being transferred to a purchaser either in their entirety, for assets described above under (i), or through a license obtained through or from the divesting defendant, for assets described above under (ii). Notwithstanding the foregoing, in the Indianapolis MTA Overlapping Wireless Market, as defined below, the divesting defendant shall not be required to divest those assets used solely to provide wireless service on a resale basis and contracts with customers served on a resale basis. Defendants shall identify in a schedule submitted to plaintiff and filed with the Court, as expeditiously as possible following the filing of the Complaint in this case and in any event prior to any divestitures and before the approval by the Court of this Final Judgment, any intellectual property rights under

third party licenses that are used by the wireless businesses being divested but that defendants could not transfer to a purchaser entirely or by license without third party consent, and the specific reasons why such consent is necessary and how such consent would be obtained for each asset.

In the event that defendants elect to divest an interest in a PCS business in one of the PCS/Cellular Overlap Areas, defendants may retain up to 10 MHz of broadband PCS spectrum within that PCS/Cellular Overlap Area upon completion of the divestiture of the Wireless System Assets.

D. "Overlapping Wireless Markets" means the following Metropolitan Statistical Areas ("MSA"), Major Trading Areas ("MTA"), and Rural Service Areas ("RSA"), used to define cellular and PCS license areas by the FCC, in which Bell-South and SBC each hold ownership interests in one of the wireless licenses issued by the FCC as of the date of the filing of the Complaint in this action:

I.  Cellular Overlap Areas

A.  Baton Rouge MSA

B.  New Orleans MSA

C.  Louisiana 6 RSA–Iberville

D.  Louisiana 8 RSA–St. James

E.  Louisiana 9 RSA–Plaquemines

II.  PCS/Cellular Overlap Areas

A.  Los Angeles–San Diego MTA

　1.  Los Angeles MSA

B.  Indianapolis MTA

　1.  Anderson MSA

　2.  Bloomington MSA

　3.  Indianapolis MSA

　4.  Lafayette MSA

　5.  Muncie MSA

　6.  Terre Haute MSA

　7.  Indiana 5 RSA–Warren

　8.  Indiana 7 RSA–Owen

9. Indiana 8 RSA–Brown

10. Indiana 9 RSA–Decatur

E. "SBC/BellSouth Wireless Joint Venture" means the joint venture between SBC and BellSouth, as detailed in the Contribution and Formation Agreement between SBC and BellSouth dated as of April 4, 2000, for which defendants have filed a notification pursuant to the Hart–Scott–Rodino Antitrust Improvements Act on May 8, 2000.

## III

### Applicability and Effect

A. The provisions of this Final Judgment shall be applicable to each of the defendants, as defined above, and to all other persons in active concert or participation with any of them who shall have received actual notice of this Final Judgment by personal service or otherwise.

B. Defendants shall require, as a condition of the sale or other disposition to an Interim Party, which shall be defined to mean any person other than a purchaser approved by plaintiff pursuant to Section IV.C, of all or substantially all of their assets, or of a lesser business unit containing the Wireless System Assets required to be divested by this Final Judgment, that the Interim Party agrees to be bound by the provisions of this Final Judgment, and shall also require that any purchaser of the Wireless System Assets agree to be bound by Section X of this Final Judgment.

## IV

### Divestiture of Wireless System Assets

A. Defendants BellSouth and SBC shall divest themselves of the Wireless System Assets of one of the two wireless businesses in each of the Overlapping Wireless Markets, including both any di-

rect or indirect financial ownership interests and any direct or indirect role in management or participation in control, to a purchaser or purchasers acceptable to plaintiff in its sole discretion, or to a trustee designated pursuant to Section V of this Final Judgment in accordance with the following schedule:

1. The divestitures of the Wireless System Assets for each Cellular Overlap Area and the Indianapolis MTA PCS/Cellular Overlap Area shall occur prior to or at the same time as consummation of the transaction that gives rise to the overlap.

2. The divestiture of the Wireless System Assets for the Los Angeles–San Diego MTA PCS/Cellular Overlap Area shall occur prior to or at the same time as consummation of the transaction that gives rise to the overlap, or by January 27, 2001, whichever is later.

3. For the Wireless Overlap Markets defined in Section II.D.II, plaintiff may, in its sole discretion, extend the date by which the divestitures must occur by up to two thirty-day periods.

If the divestitures in the Overlapping Wireless Markets have not been completed as of the date of the consummation of the transaction that gives rise to the overlap, then on or before the date of the consummation of the transaction that gives rise to the overlap, defendants will submit to plaintiff a definitive Divestiture List identifying the specific Wireless System Assets to be divested; provided, however, that the identification of the specific Wireless System Assets to be divested in the Los Angeles–San Diego MTA PCS/Cellular Overlap Area is not required before December 18, 2000.

B. Defendants agree to use their best efforts to accomplish the divestitures set forth in this Final Judgment (i) as expeditiously as possible, including obtaining all

necessary regulatory approvals, and (ii) except for the Los Angeles–San Diego MTA PCS/Cellular Overlap Area, to a purchaser or purchasers at or before consummation of the transaction that gives rise to the overlap. The divestitures carried out under the terms of this decree also shall be conducted in compliance with the applicable rules of the FCC, including 47 C.F.R. § 20.6 (spectrum aggregation) and 47 C.F.R. § 22.942 (cellular cross-ownership) or any waiver of such rules or other authorizations granted by the FCC. Authorization by the FCC to conduct divestiture of a wireless business in a particular manner will not modify any of the requirements of this Final Judgment.

C. Unless plaintiff otherwise consents in writing, the divestitures pursuant to Section IV, or by trustee appointed pursuant to Section V of the Final Judgment, shall be accomplished by (1) divesting all of the Wireless System Assets in any individual Overlapping Wireless Market entirely to a single purchaser (but Wireless System Assets in different Overlapping Wireless Markets may be divested to different purchasers), and (2) selling or otherwise conveying the Wireless System Assets to the purchaser(s) in such a way as to satisfy plaintiff, in its sole discretion, that each wireless business can and will be used by the purchaser(s) as part of a viable, ongoing business engaged in the provision of wireless mobile telephone service. The divestitures pursuant to this Final Judgment shall be made to one or more purchasers for whom it is demonstrated to plaintiff's sole satisfaction that (1) the purchaser has the capability and intent to compete effectively in the provision of wireless mobile telephone service using the Wireless System Assets, (2) the purchaser has the managerial, operational and financial capability to compete effectively in the provision of wireless mobile telephone service using the Wireless System Assets, and

(3) none of the terms of any agreement between the purchaser and either of the defendants shall give defendants the ability unreasonably (i) to raise the purchaser's costs, (ii) to lower the purchaser's efficiency, (iii) to limit any line of business which a purchaser may choose to pursue using the Wireless System Assets (including, but not limited to, entry into local telecommunications services on a resale or facilities basis or long distance telecommunications services on a resale or facilities basis), or otherwise to interfere with the ability of the purchaser to compete effectively.

D. If they have not already done so, defendants shall make known the availability of the Wireless System Assets in each of the Overlapping Wireless Markets by usual and customary means, sufficiently in advance of the time of consummation of the transaction that gives rise to the overlap to enable the required divestitures to be carried out at or before the consummation of the transaction that gives rise to the overlap. Defendants shall inform any person making an inquiry regarding a possible purchase of the Wireless System Assets that the sale is being made pursuant to the requirements of this Final Judgment, as well as the rules of the FCC, and shall provide such person with a copy of the Final Judgment. With respect to the Wireless System Assets in the Los Angeles–San Diego MTA PCS/Cellular Overlap Area, the requirements of this Section IV.D shall not be imposed until December 18, 2000.

E. Defendants shall offer to furnish to all prospective purchasers, subject to customary confidentiality assurances, access to personnel, the ability to inspect the Wireless System Assets, and all information and any financial, operational, or other documents customarily provided as part of a due diligence process, including all information relevant to the sale and to the areas of business in which the wireless

business has been engaged or has considered entering, except documents subject to attorney-client or work product privileges, or third party intellectual property that defendants are precluded by contract from disclosing and that has been identified in a schedule pursuant to Section II.C. Defendants shall make such information available to plaintiff at the same time that such information is made available to any other person.

F. Except for the Los Angeles MSA, defendants shall provide the purchaser(s) and plaintiff information relating to the personnel whose principal responsibility relates to the Wireless System Assets to enable the purchaser(s) to make offers of employment.

G. Defendants shall not interfere with any negotiations by any purchaser to employ any employees who work or have worked since April 4, 2000 (other than solely on a temporary assignment basis from another part of BellSouth or SBC) with, or whose principal responsibility relates to, the divested Wireless System Assets.

H. To the extent that the wireless businesses to be divested use intellectual property, as required to be identified by Section II.C, that cannot be transferred or assigned without the consent of the licensor or other third parties, defendants shall cooperate with the purchaser(s) and trustee to seek to obtain those consents.

I. Except for the Los Angeles MSA, defendants shall warrant to all purchasers of the Wireless System Assets that the Wireless System Assets will be operational on the date of sale.

V

**Appointment of Trustee**

A. If defendants have not divested all of the Wireless System Assets in accordance with Section IV, then:

1. Defendants shall identify to plaintiff in writing the remaining Wireless System Assets to be divested in the Overlapping Wireless Markets, and this written notification also shall be provided to the trustee promptly upon his or her appointment by the Court;

2. The Court shall, on application of plaintiff, appoint a trustee selected by plaintiff, who will be responsible for (a) accomplishing a divestiture of all Wireless System Assets transferred to the trustee from defendants, in accordance with the terms of this Final Judgment, to a purchaser or purchasers approved by plaintiff under Section IV.C, and (b) exercising the responsibilities of the licensee and controlling and operating the transferred Wireless System Assets, to ensure that the wireless businesses remain ongoing, economically viable competitors in the provision of mobile wireless telecommunications services in the Overlapping Wireless Markets, until they are divested to a purchaser or purchasers, and the trustee shall agree to be bound by this Final Judgment;

3. Defendants shall submit a form of trust agreement ("Trust Agreement") to plaintiff, which must be consistent with the terms of this Final Judgment and which must have received approval by plaintiff, who shall communicate to defendants within ten (10) business days approval or disapproval of that form; and

4. After obtaining any necessary approvals from the FCC for the transfer of control of the licenses of the remaining Wireless System Assets to the trustee, defendants shall irrevocably divest the remaining Wireless System Assets to the trustee, who will own such assets (or own the stock or other ownership interest of the entity owning such assets, if divestiture is to be effected by the creation of

such an entity for sale to purchaser(s)) and control such assets, subject to the terms of the approved Trust Agreement.

B. After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Wireless System Assets, which shall be done within the time periods set forth in this Final Judgment. In addition, notwithstanding any provision to the contrary, plaintiff may, in its sole discretion, require the divesting defendant to include any additional PCS spectrum it would propose to retain under Section II.C in the Wireless System Assets to be divested if it would facilitate the prompt divestiture to an acceptable purchaser. The trustee shall have the power and authority to accomplish the divestiture to a purchaser acceptable to plaintiff at such price and at such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Section V.C of this Final Judgment, the trustee shall have the power and authority to hire at the cost and expense of defendants any investment bankers, attorneys, or other agents reasonably necessary in the judgment of the trustee to assist in the divestiture and in the management of the Wireless System Assets transferred to the trustee, and such professionals and agents shall be accountable solely to the trustee.

C. Defendants shall not object to a sale by the trustee on any grounds other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to plaintiff and the trustee within ten (10) days after the trustee has provided the notice required under Section VI of this Final Judgment.

D. The trustee shall serve at the cost and expense of defendants, on such terms and conditions as plaintiff approves, and shall account for all monies derived from the sale of the Wireless System Assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Wireless System Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E. Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture, including their best efforts to effect all necessary regulatory approvals. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the Wireless System Assets, and defendants shall develop financial or other information relevant to the Wireless System Assets as the trustee may reasonably request, subject to reasonable protection for trade secrets or other confidential research, development, or commercial information. As required and limited by Sections IV.E and F of this Final Judgment, defendants shall permit prospective purchaser(s) of the Wireless System Assets to have reasonable access to personnel and to make such inspection of the Wireless System Assets to be sold and any and all financial, operational, or other documents and other information as may be relevant to the divestiture required by this Final Judgment. Defendants shall take no action to interfere with or to im-

pede the trustee's accomplishment of the divestiture.

F. After its appointment, the trustee shall file monthly reports with the parties and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment; provided, however, that, to the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring the Wireless System Assets to be sold, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Wireless System Assets.

G. The Trustee shall divest the Wireless System Assets in each of the Overlapping Wireless Markets to a purchaser or purchasers acceptable to plaintiff in its sole discretion, as required in Section IV.C of this Final Judgment, no later than one hundred and eighty (180) calendar days after the Wireless Systems Assets are transferred to a trustee; provided, however, that if applications have been filed with the FCC within the one-hundred-eighty-day period seeking approval to assign or transfer licenses to the purchaser(s) of the Wireless System Assets but approval of such applications has not been granted before the end of the one-hundred-eighty-day-period, the period shall be extended with respect to the divestiture of those Wireless System Assets for which final FCC approval has not been granted until five (5) days after such approval is received.

H. If the trustee has not accomplished the divestiture of all of the Wireless System Assets within the time specified in Section V.G of this Final Judgment, the trustee shall file promptly with this Court a report setting forth: (1) the trustee's efforts to accomplish the required divestiture; (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished; and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to plaintiff. The parties shall have the right to be heard and to make additional recommendations consistent with the purpose of this Final Judgment. The Court thereafter shall enter such orders as it deems appropriate in order to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by plaintiff.

I. After defendants transfer the Wireless System Assets to the trustee, and until those Wireless System Assets have been divested to a purchaser or purchasers approved by plaintiff pursuant to Section IV.C or Section V, the trustee shall have sole and complete authority to manage and operate the Wireless System Assets and to exercise the responsibilities of the licensee, and shall not be subject to any control or direction by defendants. Defendants shall not retain any economic interest in the Wireless System Assets transferred to the trustee, apart from the right to receive the proceeds of the sale or other disposition of the Wireless System Assets. The trustee shall operate the wireless business(es) as a separate and independent business entity from SBC or BellSouth, with sole control over operations, marketing and sales. SBC and BellSouth shall not communicate

with, or attempt to influence the business decisions of, the trustee concerning the operation and management of the wireless businesses, and shall not communicate with the trustee concerning the divestiture of the Wireless System Assets or take any action to influence, interfere with, or impede the trustee's accomplishment of the divestitures required by this Final Judgment, except that defendants may communicate with the trustee to the extent necessary for defendants to comply with this Final Judgment and to provide the trustee, if requested to do so, with whatever resources or cooperation may be required to complete the divestitures of the Wireless System Assets and to carry out the requirements of this Final Judgment. In no event shall defendants provide to, or receive from, the trustee or the wireless businesses under the trustee's control any non-public or competitively sensitive marketing, sales, or pricing information relating to their respective mobile wireless telecommunications service businesses.

## VI

### Notification

A. Within two (2) business days following execution of a binding agreement to effect, in whole or in part, any proposed divestiture required by this Final Judgment, the defendant that is divesting the Wireless System Assets, or the trustee, whichever is responsible for effecting the required divestitures, shall notify plaintiff of the proposed divestiture. If the trustee is responsible for the divestiture, the trustee shall similarly notify defendants. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered to, or expressed an interest in or a desire to, acquire any ownership interest in the Wireless System Assets being divested, together with full details of same.

B. Within fifteen (15) calendar days of receipt by plaintiff of such notice, plaintiff may request from defendants, the proposed purchaser(s), any other third party, or the trustee (if applicable) additional information concerning the proposed divestiture, the proposed purchaser(s), and any other potential purchaser(s). Defendants and the trustee shall furnish any such additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C. Within thirty (30) calendar days after receipt of the notice, or within twenty (20) calendar days after plaintiff has been provided the additional information requested from defendants, the proposed purchaser(s), any third party, and the trustee, whichever is later, plaintiff shall provide written notice to defendants and the trustee, if there is one, stating whether or not plaintiff objects to the proposed divestiture. If plaintiff provides written notice that it does not object, then the divestiture may be consummated subject only to defendants' limited right to object to the sale under Section V.C of this Final Judgment. Absent written notice that plaintiff does not object to the proposed purchaser(s) or in the event of an objection by plaintiff, a divestiture proposed under Section IV or V shall not be consummated. Upon objection by a defendant under Section V.B, a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII

### Affidavits

A. Within twenty (20) calendar days of the filing of the Complaint in this matter and every thirty (30) calendar days there-

after until the divestitures have been completed, each defendant shall deliver to plaintiff an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Wireless System Assets and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a summary of the efforts that defendants have made to solicit a purchaser(s) for the Wireless System Assets and to provide required information to prospective purchasers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objections by plaintiff to information provided by defendants, including limitations on information, shall be made within fourteen (14) days after receipt of such affidavit.

B. Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to plaintiff an affidavit which describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to preserve the Wireless System Assets pursuant to this Final Judgment. Defendants shall deliver to plaintiff an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C. Defendants shall preserve all records of all efforts made to preserve and divest any or all of the Wireless System Assets until one year after such divestiture has been completed.

# VIII

## Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

# IX

## Hold Separate

A. Until accomplishment of the divestitures of the Wireless System Assets to purchaser(s) approved by plaintiff pursuant to Section IV.C, each defendant shall take all steps necessary to ensure that each of the wireless businesses that it owns or operates in the Overlapping Wireless Markets shall continue to be operated as a separate, independent, ongoing, economically viable and active competitor to the other mobile wireless telecommunications providers operating in the same license area; and that except as necessary to comply with this Final Judgment, the operation of said wireless businesses (including the performance of decision-making functions relating to marketing and pricing) will be kept separate and apart from, and not influenced by, the operation of the other wireless business, and the books, records, and competitively sensitive sales, marketing, and pricing information associated with said wireless businesses will be kept separate and apart from the books, records, and competitively sensitive sales, marketing, and pricing information associated with the other wireless business.

B. Until the Wireless System Assets in each Overlapping Wireless Market have been divested to purchaser(s) approved by plaintiff, or transferred to a trustee pursuant to Section V of this Final Judgment, each defendant shall in accordance with past practices, with respect to each wireless business that it has an ownership in-

terest in or operates in the Overlapping Wireless Markets (including the assets of both wireless businesses in any Overlapping Wireless Market where the wireless business that will be divested has not yet been decided):

1. Use all reasonable efforts to maintain and increase sales of wireless mobile telephone services, and maintain and increase promotional, advertising, sales, technical assistance and marketing support for the mobile telephone services sold by the wireless businesses;

2. Take all steps necessary to ensure that the Wireless System Assets are fully maintained in operable condition and shall maintain and adhere to normal maintenance schedules;

3. Provide and maintain sufficient lines and sources of credit and working capital to maintain the Wireless System Assets as viable ongoing businesses;

4. Not remove, sell, lease, assign, transfer, pledge or otherwise dispose of or pledge as collateral for loans, any asset of each wireless business that it has an ownership interest in or operates in the Overlapping Wireless Markets, other than in the ordinary course of business, except as approved by plaintiff;

5. Maintain, in accordance with sound accounting principles, separate, true, accurate and complete financial ledgers, books and records that report, on a periodic basis, such as the last business day of each month, consistent with past practices, the assets, liabilities, expenses, revenues, income, profit and loss of each wireless business that it has an ownership interest in or operates in the Overlapping Wireless Markets;

6. Be prohibited from terminating, transferring, or reassigning any employees who work or have worked since April 4, 2000 (other than solely on a temporary assignment basis from another part of SBC or BellSouth) with, or whose principal responsibility relates to the Wireless System Assets, except (a) in the ordinary course of business, (b) for transfer bids initiated by employees pursuant to defendants' regular, established job-posting policies, or (c) as necessary to promote accomplishment of defendants' obligations under this Final Judgment; and

7. Take no action that would impede in any way or jeopardize the licensing, operation, or divestiture of the Wireless System Assets.

C. On or before the consummation of the SBC/BellSouth Wireless Joint Venture, defendants shall assign complete managerial responsibility over each wireless business that they have an ownership interest in or operate in the Overlapping Wireless Markets, to a specified manager who shall not participate in the management of any of defendants' other businesses, until, for each Overlapping Wireless Market, defendants have submitted a definitive Divestiture List pursuant to Section IV.A. Upon submission of the definitive Divestiture List, only the defendant who owns the Wireless System Assets to be divested shall be subject to the provisions of this Section IX of this Final Judgment. Notwithstanding any of the foregoing, for the purposes of Section IX and for the Los Angeles–San Diego MTA PCS/Cellular Overlap Area only, BellSouth's interests in Wireless System Assets that are not a part of the SBC/BellSouth Wireless Joint Venture are subject to all provisions of this Section IX, and SBC is subject only to the provisions of Section IX.D as it relates to Section VII.

D. Each defendant shall, during the period before all Wireless System Assets have been divested to a purchaser(s) or transferred to the trustee pursuant to Section V of this Final Judgment, appoint a

person or persons to oversee the Wireless System Assets owned by that defendant, who will be responsible for defendants' compliance with the requirements of Sections VII and IX of this Final Judgment. Such person(s) shall not be an officer, director, manager, employee, or agent of the other defendant.

## X

### Compliance Inspection

For the purposes of determining or securing compliance of defendants with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by plaintiff, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to the relevant defendant, shall be permitted:

1. access during office hours of defendants to inspect and copy, or at plaintiff's option, demand defendants provide copies of, all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or control of defendants, who may have counsel present, relating to any matters contained in this Final Judgment; and

2. to interview, either informally or on the record, defendants' officers, directors, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the interviewee's reasonable convenience and without restraint or interference by defendants.

A. Upon the written request of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

B. No information or documents obtained by the means provided in this section shall be divulged by plaintiff to any person other than a duly authorized representative of the Executive Branch of the United States, or to the FCC (pursuant to a customary protective order or a waiver of confidentiality by defendants), except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

C. If, at the time information or documents are furnished by defendants to plaintiff, defendants represent and identify in writing the material in any such information or documents as to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then plaintiff shall give defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding) to which defendants are not a party.

## XI

### No Reacquisition

A. Defendants may not reacquire any part of the spectrum licenses issued by the Federal Communications Commission ("FCC") and all other licenses, permits and authorizations divested pursuant to this Final Judgment in the MSAs and RSAs listed in Section II.D.I and the following BTAs within the Indianapolis MTA listed in Section II.D.II.B: BTA 015

Anderson, IN; BTA 039 Muncie, IN; BTA 373 Richmond, IN; BTA 442 Terre Haute, IN; and BTA 457 Vincennes–Washington, IN ("Restricted BTAs"), provided, however, the divested spectrum licenses in the Restricted BTAs may be reacquired in connection with the proposed Cingular/AT & T Wireless Acquisition if the conditions in Subsection B are met.

B. Defendants may reacquire the divested spectrum in the Restricted BTAs if they do not also acquire as a result of the Cingular/AT & T Wireless Acquisition any interest (equity, financial, or otherwise) in, any ability to exercise control over, or any right to use the spectrum covered by the Partnership Licenses in any of the Restricted BTAs, except as noted below. In furtherance of this, defendants shall:

1. Provide to plaintiff for its approval, in its sole discretion, copies of all agreements entered into by the defendants or AT & T Wireless with the owners of the Partnership Licenses, including amendments to the existing agreements between AT & T Wireless and Von Donop, so that plaintiff will have the opportunity to review them before this Final Judgment is modified. No term shall be included in said agreements or amendments that would in any way limit Von Donop's ability to make the spectrum covered by the Partnership Licenses available to other users. The agreements may be contingent on the closing of the Cingular/AT & T Wireless Acquisition;

2. Not acquire, directly or indirectly, any rights to influence or control how the Partnership Licenses are used, sold or leased, nor shall defendants and AT & T Wireless have any control over the identity of any purchasers or lessees, or the price

or any other terms and conditions of sale or lease;

3. Be prohibited from acquiring any managerial, administrative, financial or legal interest in the Partnership Licenses or entering into any arrangement that allows them to use the Partnership Licenses; and

4. Notify plaintiff 30 days before the implementation of any changes in the relationship between defendants or AT & T Wireless and Von Donop.

The defendants may retain a limited interest in the proceeds of any sale or lease of the Partnership Licenses, provided that (1) such interest influences neither whether the Partnership Licenses are sold or leased nor the terms on which they are offered and (2) such interest is capped at the total amount of debt incurred by Von Donop in acquiring the Partnership Licenses and any tax consequences to Von Donop from the agreements referenced in Subsection B.1.

Any breach of these conditions by defendants, while defendants own, operate, or control any of the reacquired licenses in the Restricted BTAs shall violate this Final Judgment.

C. For purposes of Section XI, the following definitions will apply:

1. "AT & T Wireless" means AT & T Wireless Services Inc., its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

2. "Cingular/AT & T Wireless Acquisition" means the proposed acquisition of AT & T Wireless by SBC/BellSouth Wireless Joint Venture encompassed in The Agreement and Plan of Merger dated February 17, 2004.

3. "Partnership Licenses" means the following spectrum licenses issued by the FCC:

| Call Sign | Market | Channel Block | MHz | Frequencies |
|---|---|---|---|---|
| WPOK609 | BTA015– | C | 30 | 1895.00–1910.00 |
| | Anderson, IN | | | 1975.00–1990.00 |
| WPOK648 | BTA309– | C | 30 | 1895.00–1910.00 |
| | Muncie, IN | | | 1975.00–1990.00 |
| WPOK655 | BTA373– | C | 30 | 1895.00–1910.00 |
| | Richmond, IN | | | 1975.00–1990.00 |
| KNLF314 | BTA442– | C1 | 15 | 1902.50–1910.00 |
| | Terre Haute, IN | | | 1982.50–1990.00 |
| KNLF305 | BTA457– | C1 | 15 | 1902.50–1910.00 |
| | Vincennes– Washington, IN | | | 1982.50–1990.00 |

4. "Von Donop" means Von Donop Inlet PCS, LLC, its owners, partners, successors, and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees, including but not limited to its successors or assigns related to the Partnership Licenses.

## XII

### Retention of Jurisdiction

Jurisdiction is retained by this Court for the purposes of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of the provisions hereof, for the enforcement of compliance herewith, and for the punishment of any violations hereof.

## XIII

### Expiration of Final Judgment

Unless this Court grants an extension, this Modified Final Judgment shall expire on the tenth anniversary of the entry of the original Final Judgment, December 29, 2000.

## XIV

### Public Interest Determination

The entry of this judgment is in the public interest.